921 So.2d 1066 (2006)
STATE of Louisiana
v.
Lawrence HOOKER.
No. 05-KA-251.
Court of Appeal of Louisiana, Fifth Circuit.
January 17, 2006.
*1068 Paul D. Connick, Jr., District Attorney, Terry M. Boudreaux, Thomas J. Butler, Bobby Ray T. Malbrough, Assistant District Attorneys, Parish of Jefferson, Gretna, Louisiana, for Plaintiff/Appellee.
Holli Herrle-Castillo, Louisiana Appellate Project, Marrero, Louisiana, for Defendant/Appellant.
Panel composed of Judges JAMES L. CANNELLA, MARION F. EDWARDS, and SUSAN M. CHEHARDY.
JAMES L. CANNELLA, Judge.
The Defendant, Lawrence Hooker, appeals from his conviction of second degree murder, in violation of La.R.S. 14:30.1. We affirm the conviction and sentence.
The Defendant was indicted on March 11, 2004 with the second degree murder of Jacques Malloy (Malloy).[1] He pled not guilty, was tried by a 12 person jury on October 5, 6, and 7, 2004, and was found guilty as charged. He filed a motion for new trial that was denied on October 28, 2004. On that same date, after sentencing delays being waived, the trial judge sentenced him to life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence. The Defendant's subsequent motion for appeal was granted.
Tuckson testified that, on the night of January 15, 2004, the Defendant met him while socializing with some other men, and agreed to drive him to a drug "hustle." The Defendant drove Tuckson to a location in Kenner, Louisiana where Tuckson made a crack cocaine sale. The two men were in the Defendant's Mitsubishi Galant automobile. After making the sale, the two men were on their way to Tuckson's sister's house when Tuckson noticed Percy Oliver (Oliver) and a man later identified as Malloy riding a bicycle on 30th Street in Kenner. Tuckson testified that the Defendant stopped the vehicle and, as Malloy and Oliver rode by, exited the vehicle to check the back tire, because he thought it was flat. Tuckson noticed Oliver grab for something and watched as the Defendant shot a gun in the direction of the men riding the bicycle. Tuckson then saw the Defendant shoot Malloy, walk to him, stand over him, and shoot Malloy again as he lay on the ground.[2]
Tuckson testified that he was sitting in the passenger seat during the shooting, that the Defendant had been driving the vehicle, and that he (Tuckson) never got out of the car. Tuckson stated that the Defendant was wearing a jean jacket and a red "du-rag" at the time of the incident. He asserted that he did not know Malloy or have a problem with Oliver, and that, to his knowledge, the Defendant did not know either of the men. Tuckson admitted that, in exchange for his testimony, the State dropped the second degree murder and escape charges against him, substituting an accessory charge, that he was not *1069 multiple billed, and he received a sentence of five years imprisonment at hard labor.
Oliver testified that he and Malloy, his best friend, were going home from his girlfriend's house when the homicide occurred. Oliver was riding on the handle bars of the bicycle, being pedaled by Malloy, when a white Mitsubishi Galant passed them. Oliver recognized and identified Tuckson as the front seat passenger. Oliver testified that the vehicle passed them and turned the corner, where it stopped. Oliver and Malloy bicycled past the stopped car. At first, Oliver did not see anyone outside the vehicle. Then, Oliver observed the Defendant at the back of the vehicle checking the tire. Oliver testified that the Defendant started shooting, that he looked in the Defendant's face, that he saw the Defendant standing over Malloy, who was then laying on the ground, and that he saw the Defendant shoot Malloy. Oliver ran to a Shell convenience store and then to a Circle K store where he told the people there to call the police. Afterwards, he ran home to tell his and Malloy's family what happened. A police officer came to his house and picked him up to take him to the Kenner Police station. As they were traveling down Veterans Boulevard, Oliver saw the white Mitsubishi Gallant and identified the Defendant as the man who shot Malloy.
Oliver gave several statements. In the initial statements to the investigating officers in the early morning hours of January 16, 2004, he implicated Tuckson as the passenger. Later, at 4:48 p.m., in a recorded statement to the police he said that he did not recognize the men in the car. Then on February 9, 2004, he executed an affidavit stating that he changed his story relative to the identifications due to fear for his life, and reasserted that his initial statement was true. In August of 2004, in a recorded statement, he again recanted the identifications to a white male and a black male, in the presences of Tuckson's mother and half-brother. At some point, Oliver was placed in protective custody by the police and moved to two different locations after receiving death threats from Kevin Burbank (Burbank). He eventually returned home, despite the threats. Burbank was arrested for making the threats.
In the recorded statement made on January 16, 2004 at 4:48 p.m., Oliver said that he and Malloy left Oliver's girlfriend's house at 12:30 a.m. and were on their way home when Oliver noticed that a white four-door Mitsubishi Galant was following them. He stated that the white vehicle stopped at the stop sign, turned the corner, and then one of the "dudes" got out on the driver's side, checked his tire while they rode past. Oliver said that there were two people sitting in the front of the vehicle, one on the driver's side and one on the passenger's side. Oliver stated that he had never seen that vehicle or those "dudes" before. He described the "dude" who got out of the vehicle as chubby faced, dark-skinned, approximately 5 feet 11 inches, that he had a red "du-rag" on his head and was wearing a black jacket. Oliver said that only the driver got out of the vehicle, and that he did not see the driver's face, but that the "rag gave him away." When he looked back, the driver was over his "dawg" (Malloy) and "he just shot him in the head." According to Oliver, the driver then got into the vehicle and drove off.
In that statement, Oliver said that he heard six shots, and afterwards, he cried and ran to the Shell parking lot and then to the Circle K where someone called the police. The police went to Oliver's house and then brought him to Veterans Boulevard. The Defendant's car had been stopped by the police for traffic violations and was being detained. When they arrived, Oliver positively identified the vehicle *1070 and said, "[y]eah, that's the people, cause I spotted the same, red do rag. He must've ... They said they had clothes in the trunk so they must've went somewhere and changed clothes ..." Oliver said that he saw three men at the scene on Veterans Boulevard and recognized the driver of the car as the shooter.
Oliver later stated that at the time of the shooting, when he looked back, he saw the person with the red "du-rag" and black jacket stand over Malloy and shoot him. He said that he did not see the gun go off, but as he was looking, he saw the person over Malloy, and then heard, "boom." Oliver was unable to think of any reasons why this would happen, and he could think of no one who would have reason or want to harm or kill him or Malloy.
On February 9, 2004, Oliver signed an affidavit with the Kenner Police Department stating that he had made a positive identification of the Defendant as the shooter and of Tuckson as the second perpetrator of the homicide, that he had been intimidated and harassed following those identifications, and that under duress and fear for his and his family's safety, provided an untruthful statement, recanting his identifications to an unknown black male and white male, who identified themselves to him as defense attorneys.
Oliver testified at trial that after he gave the statement, a man named Burbank threatened to kill him. Oliver further testified that he was scared. He admitted that Ron Jefferson (Jefferson), Tuckson's half-brother, gave him some money which he used to buy a motorcycle for $286. He said that Jefferson took Oliver to a lawyer's office where Oliver gave a videotaped statement that was played for the jury.
The videotaped statement showed a woman who identified herself as attorney Deidre Peterson and stated that the date was August 22, 2004. Oliver said in the videotape that he was there of his own free will and had not been threatened. He stated that he and Malloy were traveling down 30th Street on a bicycle when someone started shooting. He said that he did not see who was shooting. He said that he saw Malloy on the ground, but did not see who shot him. Defendant stated that he did not see Tuckson and that Tuckson was not involved in the shooting in any way. He said that he had previously given a statement saying that Tuckson was involved, but that statement was not true. Defendant also said that the police had forced him to sign an affidavit that was not true either.
Jasmine Thomas (Jasmine) heard the shots on January 16, 2004 in the early morning hours. Jasmine was sleeping in the living room on the sofa at her grandparents' house when she heard what sounded like firecrackers.[3] When she got up and looked out the window, she saw a man dressed in black standing over what appeared to be a body on the corner of 30th and Huntsville. Jasmine observed the person, who was standing over the body, get into the driver's side of a white vehicle that looked like a Mercedes. She saw the person on the passenger side get out of the vehicle, go to the trunk, and then to the body. Jasmine testified that, as the passenger was standing over the body, the vehicle drove off. She first testified that she could not see the color of the passenger's clothes, but then she later testified that the passenger was wearing gray.
Henry Thomas, Jasmine's grandfather, testified that his granddaughters, Jasmine and Melissa, awakened him, and told him it sounded like somebody was shooting fireworks. Henry Thomas got out of bed, went to the front window and looked out, *1071 and saw a bicycle lying down by a stop sign. He got in his truck and drove to the stop sign where he saw a bicycle and a body. He called 911 and informed them that a body was located at the intersection of 30th Street and Huntsville.[4] The police came to his house and spoke to him and Jasmine. Henry Thomas testified that he did not hear or see anything prior to being awakened.
Officer Brian Labruzza of the Kenner Police Department stopped the Defendant for a traffic violation on January 16, 2004, at 12:51 a.m. He stated that he pulled over a white Mitsubishi in the 800 block of Veterans Boulevard because the driver made an illegal u-turn and was not wearing a seatbelt. Officer Labruzza identified the Defendant as the driver of that vehicle. He noted that two other individuals were in the vehicle. They identified themselves as Melvin and Ernest Zeno. Officer Labruzza knew at the time he pulled the vehicle over that there had been a homicide committed shortly before in Kenner, and that the perpetrator was possibly in a white, four-door Mitsubishi Galant. Officer Labruzza testified that each of the three occupants had an open can of Budweiser beer in his hand, and that the Defendant did not have a drivers' license.
Officer Dominick Rodi of the Kenner Police Department testified that in the early morning hours of January 16, 2004, he received a call to pick up Oliver. Officer Rodi went to the 200 block of Baylor where he found Oliver outside "hysterical, yelling, screaming, and crying" that "dawg" had been shot.[5] Oliver explained to him that his "dawg" was his friend, Malloy. Officer Rodi testified that he placed Oliver in his unit and was en route to the scene of the shooting when he heard over the radio that another officer had conducted a traffic stop on Veterans Boulevard of a vehicle fitting the description of the one involved in the homicide. On the way to that scene, Oliver spotted the car being detained by Officer Labruzza. Oliver started yelling, "[t]hat's the vehicle." Officer Rodi approached the vehicle and notified the on-scene officers that he had a victim in his unit. Officer Rodi testified that the police officers had the subjects stand outside the white vehicle, and that Oliver positively identified the Defendant. He further testified that Oliver said "[w]here is Dashawn?" multiple times.
Detective Chad Jacquet testified that he learned from his investigation that the Defendant had been present at 2711 Panama Street on the evening of January 15, 2004 and the early morning hours of January 16, 2004 along with Tiaka Jones, Tuckson (Jones' brother), Bryant Zeno (who resided at 2711 Panama Street with Jones), Melvin and Marvin Zeno (Bryant's nephews), and Burbank (Tuckson's friend). Detective Jacquet explained that they received information that the Defendant and some of these people had stopped and purchased a case of beer on January 15, 2004, at 10:36 p.m., at Brother's Food Mart at 1227 Veterans Boulevard in Kenner, approximately two hours before the homicide. Detective Jacquet obtained a surveillance compact disc (CD) from Brothers' Food Mart (that was played for the jury), which showed a white Mitsubishi Galant (the same vehicle the Defendant was driving at the time of his arrest) enter the parking lot, and individuals getting out of the vehicle, going into the store, selecting the beer, and bringing it to the register for purchase. As the CD was played for the jury, Detective Jacquet identified the Defendant as wearing a red "du-rag" on his head and sky blue boots.[6] Detective *1072 Jacquet remembered that the Defendant was wearing a black jacket, dark colored sweatpants, the "du-rag", and sky blue boots when he was arrested. He also stated that the CD indicated that Burbank was with the Defendant on the night of the homicide.
Detective Jacquet testified that approximately three-and-a-half weeks prior to the homicide, Burbank and Tuckson were the victims of a shooting that occurred in Kenner, that Burbank suffered a gunshot wound, and that Tuckson was grazed by a bullet. The Detective had received information that Oliver was in the area when that shooting occurred, but actually Percy Ramsey had perpetrated that shooting.
Detective Jacquet also testified that Burbank was arrested in connection with the threats made to Oliver, that Oliver was placed into protective custody because he had been threatened, and that Oliver moved several times because Tuckson's family found him.
The bullets from the victim's body and the shell casings collected from the scene were turned over to the appropriate technicians and delivered to the crime lab. Detective Jacquet stated that the weapon used to shoot Malloy was a .380 caliber weapon and that it was never recovered. A search of the white Mitsubishi Galant disclosed a .25 Beretta hidden in the lining of the trunk. A gray sweatshirt was recovered from the trunk of Tuckson's vehicle.
Chad Pilfield, a crime scene technician with the Kenner Police Department, testified that he lifted fingerprints from the white Mitsubishi Galant and turned them over to Sergeant Allen Abadie. Sergeant Abadie, a latent fingerprint examiner with the Kenner Police Department, testified that the fingerprints lifted from the front driver's side door of the white Mitsubishi Galant, were positively identified as the Defendant's fingerprints. He also conducted fingerprint analyses on many other things, including casings, cartridges, and bullets, and did not recover any fingerprints from those items.
A presumptive gunshot residue test performed on the Defendant's hands following his arrest was negative. Detective Jacquet testified that gunshot residue could be easily washed or wiped off.
Dr. Susan Garcia, a qualified expert in the field of anatomical, clinical, and forensic pathology, conducted the victim's autopsy. Dr. Garcia testified that Malloy sustained four identifiable entrance wounds on his body, three on the back of his neck, and one in his left midback region. The lethal wound was caused when one of the bullets went through one of the vertebral bodies of Malloy's spinal column and injured his aorta. Doctor Garcia recovered one projectile lodged in Malloy's heart, one from his clothing, and two more from the body. Dr. Garcia testified that all wounds came from the rear to the side.
Louise Walzer, an expert in the fields of firearms examination and forensic science, was the assistant crime lab director and senior firearms examiner with the Jefferson Parish Crime Lab. She examined the four Winchester .380 auto caliber fired cartridge cases and determined that they were fired by the same weapon.
Jim Williams, Tuckson's attorney, testified that if the district attorney had filed a multiple bill against Tuckson, the trial judge could have given him up to 10 years imprisonment on either the escape charge or the accessory after the fact charge.
Christine Kogos, a stipulated expert in the field of serology, testified that she did not find any blood on the navy blue shirt, black jean jacket, blue suede boots, or gloves submitted to her in connection with this case, and that she was not asked to test any other clothing.
*1073 Officer Ronald Reggio interviewed Jasmine Thomas on the night of the shooting. She told him that she observed a vehicle with rounded lights approach as she looked out the window, that she then saw a person clad in black clothing stand over a person on the ground, that the person in black got into the driver's side rear door of the vehicle, that a person clad in gray got out of the vehicle on the passenger's side, stood over the body laying on the ground, and then went to the trunk, and that afterwards, the vehicle pulled away and the person in gray chased it until it was out of view.
The Defendant testified that he was 20 years old and had a 2002 felony conviction for possession of cocaine. He explained that, on January 15, 2004, he drove his friend's white four-door Mitsubishi Galant from New Orleans to Kenner to bring his friends, the Zenos, to visit their uncle, Bryant Zeno, on Panama Street in Kenner. After they arrived, certain members of the group went to Brother's Food Mart to purchase beer. They subsequently went back to the house on Panama Street where they socialized. Tuckson subsequently asked the Defendant to take him to sell drugs and the Defendant agreed. They met with a Caucasian man, sold the drugs, and then left to go back to Tuckson's sisters' house. The Defendant testified that he saw a couple of individuals riding on a bicycle and that he had never seen those individuals before. He claimed that Tuckson then said, "Percy is right there." When the Defendant asked Tuckson what he was talking about, Tuckson said, "[t]hat's the dude that shot me." The Defendant testified that he did not pay any attention and kept on going, but could tell that Tuckson "had something on his mind."
The Defendant stated that when they got to a stop sign, Tuckson got out of the vehicle, and he then heard a shot. The Defendant jumped out of the driver's side of the vehicle, went to the trunk to put a.25 caliber gun that he had on his person in the trunk and then got back into the vehicle. The Defendant claimed that he put the gun in the trunk because he was a convicted felon and it was illegal for him to be carrying a gun. The Defendant testified that when he was getting back into the vehicle, Tuckson was coming towards him. After the shooting, Tuckson got back into the car, and they went back to the house on Panama Street. The Defendant denied shooting Malloy and denied standing over his body.
When they got back to the house, the Defendant picked up his friends and they left. The Defendant testified that an officer subsequently pulled him over and asked him for his driver's license and registration, and whether he knew anything about a homicide. The Defendant denied knowing about the homicide.
The Defendant admitted that he was wearing his red "du-rag" when he got out of the vehicle and went to the trunk, but was not wearing it when Oliver was brought to the scene to identify him. The Defendant denied that he or any member of his family made threats to Oliver.
On appeal, the Defendant contends that the trial judge erred in failing to grant his motion for a new trial. He further requests a review for patent error.
The Defendant argues that the trial court erred by denying his motion for new trial because the only evidence that he was involved in the crime was the perjured testimony of co-defendant, Tuckson, who was given a deal in exchange for his testimony, and the testimony of Oliver, who lied several times regarding what he saw. The Defendant further contends that there was no physical evidence linking him to the murder and no believable eyewitness identifying him as the shooter. Thus, based on La.C.Cr.P. arts. 851(1) and C.Cr.P. art. *1074 851(2) and (5), the verdict was contrary to the law and the evidence, and injustice has been done.[7]
The question of sufficiency of evidence is properly raised in the trial court by a motion for post verdict judgment of acquittal. La.C.Cr.P. art. 821; State v. Ellis, 95-1005, p. 3 (La.App. 5th Cir.3/26/96), 672 So.2d 1007, 1008 (citation omitted); State v. Gibbs, 03-967, p. 14 (La.App. 5th Cir.12/30/03), 864 So.2d 866, 874, ftnt.2.
With respect to the denial of the motion for new trial based on La.C.Cr.P. art 851(1), we stated in State v. Lyles, 03-141, p. 17-18 (La.App. 5th Cir.9/16/03), 858 So.2d 35, 50 that:
The denial of a defendant's motion for new trial, based on La.C.Cr.P. art. 851(1), presents nothing for review on appeal. However, the Louisiana Supreme Court and this Court have addressed the constitutional issue of sufficiency of the evidence under such circumstances.
The standard for appellate review of the sufficiency of evidence is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier-of-fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560, 573 (1979); State v. Bailey, 04-85, p. 4 (La.App. 5th Cir.5/26/04), 875 So.2d 949, 954-955, writ denied, 04-1605 (La.11/15/04), 887 So.2d 476. When the trier-of-fact is confronted by conflicting testimony, the determination of that fact rests solely with that judge or jury, who may accept or reject, in whole or in part, the testimony of any witness. Bailey, 04-85 at 4, 875 So.2d at 955. It is not the function of the appellate court to assess the credibility of witnesses or to re-weigh the evidence. State v. Marcantel, 00-1629, p. 9 (La.4/3/02), 815 So.2d 50, 56; Bailey, 04-85 at 5, 875 So.2d at 955.
Evidence may be either direct or circumstantial. Circumstantial evidence consists of proof of collateral facts and circumstances from which the existence of the main fact may be inferred according to reason and common experience. State v. Shapiro, 431 So.2d 372, 378 (La.1982). In cases involving circumstantial evidence, La.R.S. 15:438 mandates that "assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence." A different test is applied on appellate review. In State v. Mitchell, 99-3342, p. 7 (La.10/17/00), 772 So.2d 78, 83, the Louisiana Supreme Court stated:
On appeal, the reviewing court "does not determine whether another possible hypothesis suggested by a defendant could afford an exculpatory explanation of the events." Rather, the court must evaluate the evidence in a light most favorable to the state and determine whether the possible alternative hypothesis is sufficiently reasonable that a rational *1075 juror could not have found proof of guilt beyond a reasonable doubt.
(Citations omitted; emphasis in the original).
See also: State v. Ingram, 04-551, p. 5-6 (La.App. 5th Cir.10/26/04), 888 So.2d 923, 925-926.
In a motion for new trial, the trial judge can only review the weight of the evidence and, as such, make a factual review as a "thirteenth juror," instead of following the sufficiency standard enunciated in Jackson v. Virginia. State v. Smith, 03-832, p. 5 (La.App. 5th Cir.12/9/03), 864 So.2d 679, 681. The ruling on a motion for new trial is committed to the sound discretion of the trial judge and will be disturbed on appeal only where there is a clear showing of abuse of that discretion. Id.
To prove second degree murder, the state must show (1) the killing of a human being, and (2) that the defendant had the specific intent to kill or inflict great bodily harm. La.R.S. 14:30.1(A). Specific intent is "that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act." La.R.S. 14:10(1). Specific intent may be inferred from the circumstances and actions of the accused as well as from the extent and severity of the victim's injuries. State v. Keating, 00-51, p. 5 (La.App. 5th Cir.10/19/00), 772 So.2d 740, 743, writ denied, 00-3150 (La.10/12/01), 799 So.2d 494.
In addition to proving the statutory elements of the charged offense at trial, the State is required to prove the identity of the perpetrator. Where the key issue is identification, the State is required to negate any reasonable probability of misidentification in order to carry its burden of proof. State v. Williams, 04-1016, p. 5 (La.App. 5th Cir.3/29/05), 901 So.2d 527, 530; State v. Neal, 00-0674, p. 11 (La.6/29/01), 796 So.2d 649, 658.
Here, the testimony of the eyewitnesses corroborated one another. Oliver testified that the Defendant exited the white vehicle that he was driving and started shooting at him and Malloy, and then walked over to Malloy's body, stood over it and shot Malloy again. Oliver further testified that the Defendant was wearing a black jacket and a red "du-rag" on his head at the time of the shooting, which was corroborated by the surveillance CD at Brother's Food Mart that showed the Defendant wearing a black jacket and a red "du-rag" on his head approximately two hours prior to the shooting. The Defendant admitted during trial that he was wearing a "du-rag" when he exited the vehicle. Oliver provided this information to the police shortly after the incident occurred.
Although Oliver later changed his story and said he did not know who shot Malloy, the jury could have reasonably found that the evidence showed that Oliver did so only because he had been threatened and was scared. It is noted that Oliver's testimony at trial was very similar to the statement he gave to the police immediately after the shooting. It is further noted that the evidence did not show that Oliver had a reason to lie regarding the identity of the shooter.
Tuckson testified that he was a passenger in the white vehicle with the Defendant who was driving, that the Defendant got out of the driver's side of the vehicle, started shooting at Oliver, and then walked over and shot Malloy as he lay on the ground. He further testified that defendant was wearing a jean jacket and a red "du-rag" at the time of the incident, the same clothing that Oliver said the Defendant was wearing.
Thomas corroborated the testimony of Oliver and Tuckson when she testified that she looked out the window after hearing *1076 what sounded like firecrackers and observed a man dressed in black standing over a body at the corner of 30th and Huntsville. She further testified that the man in black then got into the driver's side of a white vehicle and left. It is noted that, like Oliver, the evidence did not show that Thomas had a reason to lie regarding what she observed that night.
Although the Defendant claimed that Tuckson shot Malloy, the jury rejected this testimony and found the State's witnesses to be more credible. It is the role of the fact-finder to weigh the credibility of the witnesses, and a reviewing court will not second-guess the credibility determinations of the trier of fact beyond the sufficiency evaluations under the Jackson standard of review. Bailey, 04-85 at 4, 875 So.2d at 955. It is not the function of the appellate court to assess the credibility of witnesses or to re-weigh the evidence. Marcantel, 00-1629 at 9, 815 So.2d at 56; Bailey, 04-85 at 5, 875 So.2d at 955.
In light of the foregoing, we find that the trial judge did not err in denying the motion for new trial. Additionally, viewing the evidence in this case in the light most favorable to the prosecution, we find that a rational trier of fact could have found beyond a reasonable doubt that the Defendant committed second degree murder.

ERROR PATENT
The record was reviewed for patent errors in accordance with the Defendant's request and La.C.Cr.P. art. 920. State v. Oliveaux, 312 So.2d 337, 338 (La.1975); State v. Frazier, 03-1219, p. 8 (La.App. 5th Cir.3/30/04), 870 So.2d 1075, 1079; writ denied, 04-1290 (La.10/29/04), 885 So.2d 584. We find no patent errors in this case.
CONVICTION AND SENTENCE AFFIRMED
NOTES
[1] Co-defendant, Dashawn M. Tuckson (Tuckson), was also charged with the second degree murder of Malloy in the same indictment. However, on September 3, 2004, the State amended the indictment to charge him with accessory after the fact, in violation of La.R.S. 14:25 and 14:30.1, to which he pled guilty.
[2] Henry Thomas testified that he called 911 to report this incident on January 16, 2004. Detective Chad Jacquet of the Kenner Police Department testified that he was informed that the homicide occurred at approximately 12:30 a.m.
[3] The witness was 14 years old.
[4] The 911 call tape was played for the jury and corroborated the testimony.
[5] Oliver testified that he and Malloy lived at 202 and 228 Baylor, respectively.
[6] The compact disc corroborated Detective Jacquet's testimony.
[7] La.C.Cr.P. art. 851 provides in pertinent part:

The motion for a new trial is based on the supposition that injustice has been done the defendant, and, unless such is shown to have been the case the motion shall be denied, no matter upon what allegations it is grounded.
The court, on motion of the defendant, shall grant a new trial whenever:
(1) The verdict is contrary to the law and the evidence;
(2) The court's ruling on a written motion, or an objection made during the proceedings, shows prejudicial error....
* * *
(5) The court is of the opinion that the ends of justice would be served by the granting of a new trial, although the defendant may not be entitled to a new trial as a matter of strict legal right.