926 So.2d 657 (2006)
STATE of Louisiana
v.
Rodney NORMAN.
No. 05-KA-794.
Court of Appeal of Louisiana, Fifth Circuit.
March 14, 2006.
*658 Paul D. Connick, Jr., District Attorney, Terry M. Boudreaux, Juliet Clark, Paige Cline, Cameron Mary, Assistant District Attorneys, Gretna, LA, for Plaintiff/Appellee.
Mary Constance Hanes, Attorney at Law, New Orleans, LA, for Defendant/Appellant.
Panel composed of Judges EDWARD A. DUFRESNE, JR., JAMES L. CANNELLA, and FREDERICKA HOMBERG WICKER.
FREDERICKA HOMBERG WICKER, Judge.
Defendant, Rodney Norman, appeals his conviction and sentence on a charge of second degree murder in violation of La. R.S. 14:30.1. For reasons that follow, we affirm.
Defendant was charged with the second degree murder of Keith Landry by grand jury indictment. He entered a plea of not guilty and filed a motion to suppress his confession and identification. The motion was denied and the matter went to a trial by jury, after which defendant was found guilty as charged. In due course he was sentenced to life imprisonment without benefits. Defendant moved for a timely appeal that was granted.

FACTS
At approximately 4:45 a.m. on July 21, 2002, Deputy Jimmy Mendez of the Jefferson Parish Sheriff's Office was dispatched to Club James in Jefferson Parish and upon arrival observed a black male lying on the ground face down. The victim, Keith Landry, was shot in the back of the head. A medical unit checked the victim and found no sign of life.
At trial, Carlos Nichols testified that on the night of the murder he and the victim were drinking prior to their arrival at Club James where a friend of the victim's was having a birthday party. Mr. Nichols testified that the victim was drunk, but did not fight with anyone that night, including defendant.
Mr. Nichols did not know defendant, but saw him at the Club James on the night of the murder. Mr. Nichols stated that defendant *659 took pictures with Shawn, the person who was celebrating his birthday, and Shawn's girlfriend, Kizzy. At the time the pictures were taken the defendant was holding a gun in his hand. Kizzy gave the victim a cake to bring out to Shawn's vehicle. The victim left the club with the cake. Mr. Nichols had one more beer then went outside to join the victim.
According to Mr. Nichols, he looked over his shoulder and saw defendant push the victim, although they were not "throwing punches." Then he heard the victim say, "what the f* * *." Mr. Nichols testified that defendant was fumbling with a 9 mm gun in his waist for about six seconds. The defendant's hand was shaking as he pointed the gun at the victim's face. Thereafter, the victim looked at defendant and said, "f* * * it." The victim turned his back and took a step, and then the defendant shot him. Mr. Nichols explained that when the victim walked towards him he saw blood coming out of his ears, nose and mouth and he then fell back three or four feet from where he was. After defendant shot the victim he put the gun back in his waistband and walked towards the Westbank Expressway. Mr. Nichols stated that he identified the perpetrator to a uniformed deputy and was later shown a photographic lineup. In this lineup, Mr. Nichols confirmed his identification of the defendant. Mr. Nichols testified that there was no doubt in his mind that the defendant shot the victim on the morning of July 21, 2002.
Detective David Morales, a homicide detective with the Jefferson Parish Sheriff's Office, was assigned to investigate the murder at the Marrero nightclub. At the scene, he located a spent 9 mm cartridge casing. Detective Morales testified that after the interview with Mr. Nichols and other witnesses on the scene, defendant became a suspect. The detective admitted that he was sure that some of the people interviewed had been drinking. He testified that Sergeant Dennis Thornton took Mr. Nichols' original statement and then Sergeant Thornton showed Mr. Nichols the photographic lineup. Later the Sergeant took a second statement from Mr. Nichols. After Mr. Nichols positively identified the defendant, Detective Morales secured an arrest warrant, but was unable to locate defendant. Consequently, a wanted bulletin was prepared. A search warrant was conducted at defendant's house; however, nothing was recovered. About six weeks later defendant turned himself into authorities. At that time, the defendant gave a recorded statement which was transcribed and played for the jury.
In defendant's statement, he stated he turned himself in to tell his side of the story regarding a shooting at the Club James on Sunday, July 21st around 4:43 a.m. Defendant maintained that on Saturday night he went to Shawn's birthday party at Club James. Defendant stated that he took a gun out of his car and took pictures with it at the birthday party. Defendant stated that he had two fights that night. Defendant did not know the victim, but after the detective showed him a picture of Keith Landry from the birthday party, the defendant identified the victim as the person with whom he fought. The first fight was at the Shell Station at Ames and the Westbank Expressway. According to the defendant the victim pushed him, then he punched the victim and they began fighting. The defendant's friends pulled him away and he went to Club James. The defendant stated that the gun was in the waistband of his pants underneath his shirt. According to defendant, he was fighting with the victim near the front door of Club James when the gun dropped. The defendant stated that the victim was reaching for the gun, so he grabbed the victim to stop him from getting *660 the gun while they were fighting. The defendant said that when he picked the gun up he heard the victim say, "[m]an, why don't you go head." Defendant said he picked the gun up and as he did the gun just went off. At first, he was not even aware that he had shot the victim. He paused for a minute and then began running towards the Westbank Expressway. During the flight from the scene, the defendant threw the gun in an empty lot. He stated that he was drunk and was sorry. He said he did not mean to kill the victim. The defendant denied striking him on the head with the barrel of the gun.
Detective Morales testified that he took a statement from defendant's nephew, Joseph Norman. He testified that Joseph Norman advised him that his uncle had been drinking heavily and had told Joe that he thought he saw the person that had previously shot him. The defendant began fighting with the victim behind the Auto Zone. Although the fight was broken up, the two began fighting again in front of Club James. Joseph Norman then stated that the defendant went up behind the victim and struck him on the head with the barrel of a gun. Then, defendant shot the victim.
Detective Morales also interviewed Kenneth Beauford, who stated he was riding his bicycle near the Auto Zone when he saw two men fussing and one of the men had a pistol. According to Kenneth Beauford, friends convinced the man with the pistol to put it away and let the other man go. Kenneth Beauford's description of the person with the pistol matched the description given of the defendant that night. Detective Morales testified that, based on those two statements, he believed there was at least one altercation between the victim and defendant before the shooting.
Dr. Karen Ross, a stipulated expert in the field of forensic pathology, conducted an autopsy on the victim on July 22, 2002. She testified that the victim had a gunshot wound to his head, with the bullet entrance on the back of the left side of the head. The examination revealed no defensive wounds. In her opinion, the victim died as a result of a gunshot wound of the head and the manner of his death was a homicide. Further, Dr. Ross testified that the victim was shot in the back of the head; therefore, he was not face to face with the shooter when he was shot, and at least the muzzle of the weapon had to be behind him. Dr. Ross found no firearm residue, so the muzzle of the weapon was at least approximately three feet away from the victim at the time the weapon was discharged.
Dr. Ross testified that according to the victim's toxicology results, he had recently ingested cocaine and was most likely still drinking just before his death.

LAW
In his only assignment of error, defendant asserts the evidence presented at trial is insufficient to support the conviction for second degree murder because he lacked the requisite intent required. Defendant maintains his actions amounted to no more than negligent homicide. He also challenges the credibility of the prosecution witness, Carlos Nichols.
The State responds that the evidence is constitutionally sufficient to establish the defendant's specific intent to kill or inflict great bodily harm beyond a reasonable doubt. Further, the State argues that the trier of fact rationally concluded that Mr. Nichols' testimony was credible.
The reviewing court must determine whether, viewing the evidence, direct and circumstantial, in the light most favorable to the prosecution, any rational trier of fact could have found the defendant guilty *661 beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Ortiz, 96-1609 (La.10/21/97), 701 So.2d 922, 930, cert. denied, 524 U.S. 943, 118 S.Ct. 2352, 141 L.Ed.2d 722 (1998).
To prove second degree murder, the State must show (1) the killing of a human being, and (2) that the defendant had the specific intent to kill or inflict great bodily harm. La. R.S. 14:30.1(A)(1); State v. Pagan, 04-1478 (La.App. 5 Cir. 5/31/05), 905 So.2d 435, 441. Specific intent is "that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act." La. R.S. 14:10(1). Because specific intent is a state of mind, it need not be proven as a fact, it may be inferred from the circumstances and actions of the defendant as well as the extent and severity of the victim's injuries. State v. Pagan, 905 So.2d at 441. The discharge of a firearm aimed at a victim is indicative of intent to kill or inflict great bodily harm. State v. Robinson, 91-883 (La.App. 5 Cir. 3/31/92), 598 So.2d 407; State v. Brown, 96-1002, (La.App. 5 Cir. 4/09/97), 694 So.2d 435; writ denied, 97-1310 (La.10/31/97), 703 So.2d 19.
In the matter before us, defendant admits he shot the victim and that the two had fought previously. His statement that the two were fighting just before the shooting and the gun just "went off" is inconsistent with the eyewitness testimony and the physical evidence that shows the victim was shot in the back of the head from at least three feet away.
Whether a defendant possessed the requisite intent in a criminal case is for the trier of fact, and a review of the correctness of this determination is guided by the Jackson standard. State v. Simmons, 98-841 (La.App. 5 Cir. 6/1/99), 738 So.2d 1131, 1134, writ denied, 99-2419 (La.4/20/00), 760 So.2d 333. Given the facts presented in this case, we find the evidence presented was constitutionally sufficient to support the jury's finding that the defendant had the specific intent to kill or inflict great bodily harm to the victim.
In our review for errors patent we note an inconsistency between the transcript and the commitment with regard to sentencing. Although the commitment indicates defendant was sentenced to life imprisonment at hard labor, in the transcript the trial judge failed to state that the sentence was to be served at "hard labor." If a discrepancy exists between the commitment and the transcript, the transcript prevails. State v. Lynch, 441 So.2d 732 (La.1983). La.C.Cr.P. Art. 879 requires a court to impose a determinate sentence. If there were some discretion allowed by the applicable sentencing statute, the failure to indicate whether the sentence was to be served at "hard labor" would be an impermissible indeterminate sentence. However, since the defendant herein was sentenced pursuant to La. R.S.14:30.1 which requires a mandatory sentence of life imprisonment at hard labor, the sentence is determinate and the failure to state such is harmless error. See, State v. Porter, 99-1722 (La.App. 3 Cir. 5/3/00), 761 So.2d 115.
Accordingly, we affirm defendant's conviction and sentence.
AFFIRMED.