948 So.2d 215 (2006)
STATE of Louisiana
v.
Pierre WEATHERSPOON.
No. 06-KA-539.
Court of Appeal of Louisiana, Fifth Circuit.
December 12, 2006.
*218 Paul D. Connick, Jr., District Attorney, Terry M. Boudreaux, Thomas J. Butler, Thomas S. Block, Kenneth P. Bordelon, Assistant District Attorneys, Gretna, Louisiana, for Plaintiff/Appellee.
Holli Herrle-Castillo, Attorney at Law, Louisiana Appellate Project, Marrero, Louisiana, for Defendant/Appellant.
Panel composed of Judges MARION F. EDWARDS, CLARENCE E. McMANUS, and WALTER J. ROTHSCHILD.
MARION F. EDWARDS, Judge.
Defendant, Pierre Weatherspoon, appeals his conviction and sentence for manslaughter. For the reasons that follow, we affirm.
Sixteen-year-old defendant, Pierre Weatherspoon, was indicted by a grand jury on August 22, 2002 and charged with second-degree murder in violation of LSA-R.S. 14:30.1.[1] Weatherspoon pled not guilty and filed several pretrial motions, including a motion to suppress identifications, which was denied after a hearing. His first trial resulted in a mistrial, and he proceeded to a second trial on July 12, 2005. After a six-day trial, a unanimous twelve-person jury found Weatherspoon guilty of the lesser included offense of manslaughter, and he was sentenced to thirty-five years of imprisonment.
At approximately 7:30 p.m. on June 24, 2002, Deputy Michael Buras was on patrol when he was dispatched to the 1600 block of Betty Street in Marrero to answer a call for an aggravated battery by shooting. When he arrived, he observed a black male, later identified as fourteen-year-old Lionel Williams, lying on the ground with a pool of blood around his head. The victim was removed from the scene by EMS and transported to West Jefferson General Hospital where he was pronounced dead. A later autopsy revealed *219 the victim sustained a single gunshot wound to the back base of his head that severed his spinal cord.
Additional units arrived at the scene, and the area was canvassed for witnesses. Deputy Buras spoke to one witness, Brandon Walker, who advised that there were four people in the car involved in the shooting and specifically named defendant, Pierre Weatherspoon, as one of the four people. The on-scene investigation revealed the car involved was a white, four-door Chevy Corsica. It was determined that the same vehicle had been involved in an altercation approximately four hours earlier at a nearby convenience store on Acres Road. During the investigation into the altercation, field identification cards (FIC) had been filled out on three subjects who were found standing next to the Corsica, including Weatherspoon.
Several witnesses were transported from the scene of the shooting to the Detective Bureau where they gave statements. In their statements, three witnesses, Brandon Walker, Orlando Washington, and Brandon Washington, stated they saw Weatherspoon exit the car and shoot into the crowd of people playing and waiting to play basketball. All three witnesses independently identified Weatherspoon in a photographic lineup as one of the people they saw exit the vehicle and shoot into the crowd. At trial, all three witnesses confirmed their initial statements to the police. Orlando Washington and Brandon Washington also made in-court identifications of Weatherspoon as the person they saw shoot into the crowd but Brandon Walker, who was being held on a material witness bond prior to trial, stated he was unable to identify Weatherspoon in court.
On the night of the shooting, the police received information that Weatherspoon and the driver of the vehicle, who was identified as Troy Porea, were inside a room at the Moon Suite Inn on the Westbank Expressway. When the police arrived at the motel, they located the suspects in Room 211, at which time they were arrested.
At trial, Weatherspoon admitted he was in the car involved in the shooting but denied he was the one who exited the vehicle and shot into the crowd. Weatherspoon testified he was riding in a car with Troy Porea, Deantre Jackson, and Errasemus Thomas (a/k/a "Raz") when they drove down Betty Street. He stated someone threw a bottle at the car, at which time Porea stopped the car, grabbed a gun from under his seat, and stuck his arm out of the car window. According to Weatherspoon, Deantre exited the car from the back seat and started shooting while Raz leaned out of the back seat driver's side window and started shooting. Deantre returned to the car and Troy drove off. Troy drove to the end of Marshall Road where he disposed of the guns under a rug in the field. Thereafter, the four boys went to the Moon Suite Inn where Weatherspoon learned through television reports that the police were looking for suspects in the shooting. Deantre and Raz left to burn the car while Weatherspoon and Troy stayed behind in the room where they were subsequently arrested. Defendant denied any knowledge that a shooting was going to take place and stated he was only in the car for two minutes before the incident.
In his third assignment of error,[2] Weatherspoon asserts that the evidence *220 was insufficient to support the conviction[3] for manslaughter because the State failed to prove his identity as the shooter beyond a reasonable doubt. He further asserts that the only witnesses who identified him as the shooter were not credible. Weatherspoon maintains that three of the witnesses, Brandon Walker, Orlando Washington, and Brandon Washington, had a long history of problems with him and argues they gave conflicting statements, some which contained internal inconsistencies. He alleges that a fourth witness, Deantre Jackson, gave several different statements and was given a deal in exchange for his trial testimony. Weatherspoon contends the only unbiased witness, Autrelle White, did not identify him as the shooter.
The standard of review for the sufficiency of the evidence to uphold a conviction is whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could conclude that the State proved the essential elements of the crime beyond a reasonable doubt.[4] In addition to proving the statutory elements of the charged offense at trial, the State is required to prove defendant's identity as the perpetrator.[5] Where the key issue is identification, the State is required to negate any reasonable probability of misidentification in order to carry its burden of proof.[6]
Weatherspoon does not argue that the State failed to establish any of the essential statutory elements of his conviction, but only contends the State failed to prove beyond a reasonable doubt his identity as the offender. Therefore, we will not address the sufficiency of the evidence with respect to the statutory elements of manslaughter.[7]
Four State witnesses, Brandon Walker, Orlando Washington, Brandon Washington, and Deantre Jackson, identified defendant as the person who exited the vehicle armed with a gun and shot into a crowd of people gathered near the basketball courts on Betty Street. Immediately after the shooting, while still at the scene, Brandon Walker told the police he saw defendant get out of the car and shoot into the crowd. Walker went to the Detective Bureau, where he gave a statement. At 10:16 p.m., on the night of the shooting, Brandon Walker identified Weatherspoon in a photographic lineup as the person who exited the front passenger seat of the car and who fired shots into the crowd.
*221 After being held in jail for six months on a material witness bond, Brandon Walker testified at trial. His trial testimony corroborated his earlier statement to the police. He testified he was on Betty Street at the time of the shooting getting his hair "plaited" when he saw a white Corsica belonging to Troy Porea pass around the neighborhood four or five times. Walker testified that the car stopped and Porea exited the driver's side of the vehicle and said something as he walked toward the back of the car. Walker stated he then saw Pierre Weatherspoon get out of the car, walk to the back of the car with a gun, and open fire on the crowd. He stated that he recognized Pierre because he knew him from the neighborhood.
During his testimony, Walker stated he did not see Weatherspoon in the courtroom. Thereafter, Walker was shown the same photographic lineup containing defendant that he had been shown on the night of the shooting. Walker admitted that he had identified Weatherspoon in the photographic lineup and that he had signed and dated the back of Weatherspoon's photo. Walker testified he was 100 percent certain the person he identified in the photographic lineup was the person he saw exit the front passenger side of the car and fire into the crowd.
Walker explained he was on the passenger side of the Corsica, on the opposite side of the street as the crowd, at the time of the shooting. He stated that his view was unobstructed and that he saw Weatherspoon exit from the passenger side of the vehicle. Walker also testified that he saw Weatherspoon's face the entire time.
Orlando and Brandon Washington are brothers who were present in the crowd at the time of the shooting.[8] Both were taken directly from the scene to the Detective Bureau where they gave statements. At the time of his statement, Orlando was fifteen years old and was a friend of the victim. He told the police he saw Weatherspoon shoot into the crowd and was able to identify defendant in a photographic lineup that same night.
During his trial testimony, Orlando Washington testified that the shooting started after Jamal Taylor threw something at the passing car.[9] He stated that Troy Porea, the driver, exited the vehicle and asked who hit his car. Washington then saw Weatherspoon get out of the passenger side, walk toward the back of the car, and shoot toward the crowd. He also saw another passenger of the car, Raz, shoot into the crowd. Washington identified Weatherspoon in court as the person he saw shoot a gun into the crowd that resulted in the victim's death. Washington explained that he knew Weatherspoon from school and had known him for approximately two years prior to the shooting.
On cross-examination, Washington admitted he did not see where defendant exited the vehicle, despite telling the police in his initial statement, as well as in his testimony from a previous hearing, that Weatherspoon exited from the back passenger side. He explained he was focused on Troy Porea and did not see defendant actually exit the vehicle. Washington stated that the defendant was the only person on the passenger side of the vehicle and that defendant shot from the back passenger side of the vehicle. Washington testified he was shaken up at the time of his statement.
*222 Orlando's younger brother, Brandon Washington, also gave a statement to the police on the night of the shooting. Brandon Washington, who had just turned fourteen years old at the time, told the police he saw defendant shoot into the crowd. He explained that Weatherspoon had been in the back passenger seat and exited to the passenger side of the vehicle. He also told the police that he saw another back seat passenger, later identified as Raz, shoot into the crowd. On the same night, Brandon identified defendant and Raz in a photographic lineup. He also identified another occupant of the vehicle, Deantre Jackson, in a photographic lineup shown to him approximately two weeks after the shooting. He testified that he saw Deantre in the back seat of the vehicle but stated he did not see Deantre get out of the vehicle or shoot.
At trial, Brandon testified that he saw the occupants of the vehicle when it stopped after Jamal hit the vehicle with a bike peg. He stated that Troy Porea exited the car first, followed by defendant on the passenger side, and then Raz on the driver's side. Brandon explained that Weatherspoon started shooting as he walked toward the back of the car. Brandon stated he had an unobstructed view while he hid behind a car and peeked around it. He testified he knew Weatherspoon from "around the area." Brandon identified Weatherspoon in court as the person he was 100 percent sure exited the vehicle on the passenger side and fired a weapon into the crowd.
The testimony of Deantre Jackson was also offered to prove defendant's identity as the perpetrator. Deantre was arrested the day after the shooting on unrelated charges, at which time he gave a statement implicating defendant, Troy Porea, and Raz in the shooting.[10] At trial, Deantre explained he was in the vehicle involved in the shooting at the time of the incident.
In his June 25, 2002 statement, Deantre implicated Weatherspoon and Raz as the shooters. Deantre told the police Troy Porea stopped the car and got out to see what had hit the car when Weatherspoon and Raz hopped out and started shooting. He stated that Weatherspoon was sitting in the front passenger seat when he exited the vehicle and fired a weapon into the crowd. Deantre explained he was sitting behind Weatherspoon in the back passenger seat next to Raz. Deantre denied that he got out of the car, shot into the crowd, or that he even possessed a gun at the time of the incident. He identified Weatherspoon, Porea, and Raz in a photographic lineup at the time of his statement. At trial, Deantre corroborated his earlier statement and testified that Weatherspoon exited the front passenger seat, walked to the rear of the passenger side of the car, and started shooting into the crowd.
Weatherspoon presented the testimony of Autrelle White, who did not identify defendant as the shooter. At the time of the shooting, Ms. White, who lived on Betty Street, was sitting in a parked truck on the street. She testified she saw a bottle hit the offending car and saw the driver lean out of the window and shoot into the crowd. She also saw the two back seat riders shoot. Ms. White stated the front seat passenger did not exit the vehicle or fire any weapon. She explained that she witnessed the incident from approximately 20-27 feet away. Ms. White testified that she gave a statement to the police immediately after the shooting and indicated she could identify the perpetrators. She stated she was not shown photographs until approximately three years later and was unable to identify anyone. Ms. White testified *223 that defendant, as he was identified in court, did not get out of the car and fire into the crowd. Although Weatherspoon maintains Ms. White was the only unbiased witness, she stated at trial that she knows "his people."
Ms. White stated she had been in jail from January 2003 until February 2005. On cross-examination, she admitted that the prosecutor visited her shortly after she was released from jail and questioned her about the shooting at which time she told him she had "jail block" and could not remember people.
Weatherspoon maintains that all four identifications by the State's witnesses were wrought with inconsistencies and could not be used to prove his identity as the shooter beyond a reasonable doubt. He also challenges the credibility of Deantre, claiming he was given a deal in exchange for his testimony.
When the trier of fact is confronted by conflicting testimony, the determination of that fact rests solely with that judge or jury, who may accept or reject, in whole or in part, the testimony of any witness.[11] It is not the function of the appellate court to assess the credibility of witnesses or to re-weigh the evidence.[12]
Weatherspoon first challenges the discrepancy in the evidence regarding his location in the vehicle and the location of the shooters as described by the witnesses. He points out that both Brandon Walker and Deantre Jackson testified he was the front seat passenger, a fact that Weatherspoon admitted in his own testimony. He notes that Autrelle White testified the front passenger did not shoot.
Weatherspoon further challenges the identifications made by Orlando Washington and Brandon Washington on the basis they testified it was the two back seat passengers who jumped out and started shooting. He contends the evidence showed he was a front seat passenger and, therefore, there was a reasonable probability that Orlando Washington and Brandon Washington misidentified him as the shooter.
In their initial statements to the police, Orlando Washington and Brandon Washington stated defendant exited the back passenger seat of the vehicle. At trial, Orlando clarified that he did not see defendant actually exit the car but saw defendant shoot from the back passenger side. Brandon Washington clarified at trial that defendant exited the vehicle from the passenger side and shot while standing at the back passenger side of the car.
Although there may have been slight confusion as to whether Weatherspoon was sitting in the front or back passenger seat of the vehicle, the record shows that Brandon Walker, Orlando Washington, and Brandon Washington all testified they saw defendant exit on the passenger side of the car and walk to the back passenger side of the car where he started shooting into the crowd. Furthermore, all three eyewitnesses stated that they clearly saw defendant's face and identified him as the shooter in a photographic lineup shortly after the incident. Even though Brandon Walker refused to identify Weatherspoon in court as the shooter, the jury was able to review the photographic lineup where Brandon Walker identified defendant and conclude it was the same person sitting in court. At trial, Walker re-affirmed the identification of Weatherspoon he made in the photographic lineup.
*224 Weatherspoon also points out inconsistencies among the State's witnesses regarding the number of people they saw in the car and the number of times the car passed Betty Street before the shooting occurred. Such minor discrepancies are not unusual when the same event is recounted by different people. Despite these slight discrepancies in the witness's accounts of the events surrounding the shooting, their statements were consistent concerning the material facts of the shooting.
Weatherspoon next challenges the credibility of Brandon Walker, Orlando Washington, and Brandon Washington on the basis they had a long history of problems with him, thereby suggesting they fingered him as the shooter out of revenge. We find that nothing in the record supports defendant's assertion. In fact, Orlando and Brandon Washington testified they had no problems with defendant and Orlando specifically stated he and defendant were not enemies.
Defendant also challenges the credibility of Deantre Jackson on the basis he received a deal in exchange for his testimony against defendant. Defense counsel made the jury fully aware of Deantre's agreement with the State. Deantre was initially charged with second-degree murder and ultimately pled guilty to manslaughter in juvenile court. He was sentenced to juvenile life but was paroled, over the State's objection, after serving two years. At the time of trial, Deantre had been released from his parole, again over the State's objection.
The State presented the testimony of witnesses from the District Attorney's office involved in the screening of the charges against Deantre to rebut defendant's claim that Deantre received a deal in exchange for his testimony. The record shows that Deantre was allowed to plead guilty to manslaughter because no one identified Deantre as the shooter and he was the least culpable of the four occupants of the vehicle.
Defendant further argues that Deantre was not credible because his version of the facts surrounding the shooting differed in each statement and testimony he gave. Defense counsel more than adequately pointed out all of the inconsistencies to the jury, most of which pertained to Deantre's statements regarding Troy Porea's involvement in the shooting. For example, at trial, Deantre stated that Porea was armed but did not get out of the car. However, he initially told police that Porea was not armed and that he did get out of the car. Deantre admitted he lied about Porea's involvement and explained that Porea was one of his closest friends and he did want to be labeled a "rat."
Some other inconsistencies pointed out by defendant include Deantre's initial statement to the police that he was immediately dropped off after the shooting and that his mother picked him up and drove him home; that he did not see defendant, Troy, or Raz after they drove off; and that he had no knowledge of how the car got burned. At trial, Deantre admitted he had previously lied. He explained he went with defendant, Troy, and Raz to the Moon Suite Motel after the shooting. Deantre then admitted his personal involvement in burning the car.
The record shows Deantre's testimony pertaining to defendant's involvement as the shooter has always been consistent. In his statement to the police, his subsequent affidavit, his testimony at the motion to suppress hearing, and at trial, Deantre always stated that he saw defendant shoot a gun into the crowd. Additionally, that portion of Deantre's testimony was corroborated by three other eyewitnesses who all consistently testified that defendant exited *225 the passenger side of the vehicle, walked to the back of the vehicle, and fired into the crowd.
Similar cases have upheld convictions based on similar issues pertaining to identification evidence. In State v. Hooker,[13] this Court upheld the sufficiency of the evidence as it related to the defendant's identity in a second-degree murder conviction. The defendant argued the only evidence identifying him as the shooter was the perjured testimony of a co-defendant who was given a deal in exchange for his testimony and of another witness who lied several times regarding what he saw. This Court noted the testimony of the eyewitnesses corroborated one another. It also noted that although one witness changed his story and stated he did not know who shot the victim, the jury could have reasonably found the witness did so only because he had been threatened and was scared. This Court explained the evidence did not show the witness had reason to lie regarding the identity of the shooter. This Court further found that, although the defendant had claimed his co-defendant had been the shooter, the jury obviously rejected that testimony and found the State's witnesses to be more credible.
Likewise, in the present case, nothing in the present record demonstrates Brandon Walker, Orlando Washington, or Brandon Washington had reason to lie in identifying defendant as the shooter. And, although defendant claimed Deantre was the shooter, the jury rejected his testimony and found the State's witnesses to be more credible.
In State v. Weaver,[14] this Court found sufficient identification evidence for a second-degree murder conviction despite the fact identification was made by a witness who gave several different statements to the police and was a self-proclaimed liar at trial. Stating that the credibility of a witness is within the sound discretion of the trier of fact, who may accept or reject, in whole or in part, the testimony of any witness, this Court concluded the jury chose to believe the witness' testimony despite some discrepancies in her statement. This Court noted it was not unreasonable for the jury to excuse the discrepancies because the witness was a juvenile and was afraid. This Court further emphasized that the witness' earlier testimony implicated the defendant as being at the scene and armed with a gun during the commission of a felony even though her explanation of the incident differed from that of other witnesses.
In the present case, the jury was presented all the evidence and was made fully aware of the inconsistencies within some witnesses' statements. The jury weighed the evidence and determined the credibility of the witnesses. It was not unreasonable for the jury to excuse some of the discrepancies as inconsequential. The identification of Weatherspoon the shooter who shot into the crowd from the back passenger side of the vehicle was consistent among the State's witnesses. Viewing the evidence in a light most favorable to the prosecution, we find that the State proved defendant's identity as the perpetrator of the offense beyond a reasonable doubt.
In his first assignment of error, Weatherspoon argues the trial court erred in allowing prejudicial evidence of his gang affiliation. He maintains any evidence relating to gangs was irrelevant and violated LSA-C.E. art. 404(B), which prohibits the use of evidence to show other crimes or *226 bad acts to show bad character of the defendant to show he acted in conformity therewith. Weatherspoon asserts references to his gang membership were irrelevant to the shooting, which occurred when a bottle was thrown at the car and was unrelated to any gang activity. He contends the only purpose of the gang-related testimony was to show he was a bad person and should be convicted of something. Weatherspoon also argues the trial court erred in admitting evidence that one State witness received threatening phone calls prior to trial. He claims the phone calls were never linked to him and, therefore, were irrelevant and prejudicial.
Generally, evidence of other crimes or bad acts committed by a criminal defendant is not admissible at trial.[15] However, when evidence of other crimes tends to prove a material issue and has independent relevance other than to show that the defendant is of bad character, it may be admitted by certain statutory and jurisprudential exceptions to this rule.[16] Evidence of other crimes is allowed to prove motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, or when it relates to conduct that constitutes an integral part of the act or transaction that is the subject of the present proceeding to such an extent that the State could not accurately present its case without reference to the prior bad act.[17]
In order for other crimes evidence to be admitted under LSA-C.E. art. 404(B)(1), one of the factors enumerated in the article must be at issue, have some independent relevance, or be an element of the crime charged.[18] Further, the probative value of the extraneous evidence must outweigh its prejudicial effect.[19]
The defendant bears the burden to show that he was prejudiced by the admission of the other crimes evidence.[20]
Clearly, evidence of other crimes or bad acts is prejudicial since all evidence which tends to make it more probable than not that an individual committed a criminal offense is necessarily prejudicial. The underlying policy is not to prevent prejudice, since evidence of other crimes is always prejudicial, but to protect against unfair prejudice when the evidence is only marginally relevant to the determination of guilt of the charged crime.[21] Absent an abuse of discretion, a trial court's ruling on the admissibility of evidence pursuant to LSA-C.E. art 404(B)(1) will not be disturbed.[22]
We will first address this assignment as it pertains to "gang evidence."
On the first day of trial, prior to jury voir dire, defense counsel argued that any reference to defendant's gang affiliation was irrelevant. Defense counsel noted that the State had previously referenced defendant's membership in the GMC gang in its opening statement during the first trial and that such reference was improper evidence of other crimes or bad *227 acts.[23] After confirming that neither party intended to bring up the issue during voir dire, the trial judge proceeded with voir dire without commenting on the issue. On the second day of trial, the trial judge expressly reminded the parties of her prior ruling on the motion in limine; specifically, that she would allow gang related information into evidence.
Throughout trial, various references were made to the defendant's membership in the GMC gang. During its opening statement, the State told the jurors that Weatherspoon was a member of the GMC gang and stated the evidence would show the shooting was revenge for an earlier altercation involving members of the GMC gang. The State then presented the testimony of Deputy Harley Smith who testified about an altercation that occurred approximately three to four hours prior to the shooting. Deputy Smith stated he investigated a fight in progress at a convenient store on Acres Road, which is two blocks over from the Betty Street projects. He stated several subjects were involved which led him to fill out field identification cards on three subjects, one of whom was Weatherspoon. He ultimately arrested Brandon Porea, Troy Porea's brother, for assaulting the victim, Kenez Armand. Deputy Buras testified he learned the fight stemmed from suspicion that someone was stealing either Brandon Porea or Troy Porea's dog.
Deantre Jackson testified next and linked himself, Weatherspoon, Troy Porea, and Raz as members of the GMC gang. Defense counsel objected to the GMC gang reference and noted it was an ongoing objection. Deantre admitted that if something happened to a GMC boy, revenge would be sought on whoever did it. He explained that, on the day of the shooting, two people, Kenez Armand and Jamal Taylor, were seen on the side of the fence by Troy Porea's grandmother's house trying to steal a dog. As a result, Troy and Deantre went looking for Kenez and Jamal to beat them up. They found them at the Acres Road store and started a fight. Defendant and Troy's brother, Brandon, showed up during the fight and Brandon was ultimately arrested. According to Deantre, everyone was mad that Brandon was arrested and they decided to find Kenez and Jamal to seek revenge for Brandon's arrest. Troy Porea drove Deantre, defendant, and Raz to the Betty Street project looking for Kenez at which time someone threw something at the car prompting the shooting.
References to the GMC gang were also made during the testimony of Orlando Washington, Brandon Washington, and Brandon Walker. All three stated they knew that Weatherspoon, Troy Porea, and Raz were in the GMC gang and that none of them had any problems with the GMC gang prior to the shooting.[24]
Additionally, Lieutenant Dennis Thornton testified that defendant, Porea, and Raz were all GMC boys. Lieutenant Thornton's testimony related to Deantre's identification of the three boys explaining that they were associates of Deantre. Lieutenant Thornton also made reference to the GMC gang in identifying several pictures shown to him during his testimony. Specifically, he noted that some of the photographs contained GMC "tagging" or graffiti. These pictures were of a street leading to defendant's girlfriend's house. There was evidence that defendant called his girlfriend after the shooting.
*228 During defendant's testimony, he was questioned about his affiliation with the GMC. On direct examination, defendant admitted he had a GMC tattoo. He denied that the GMC tattoo represented a gang but, rather, stated it represented a group of friends. Defendant denied the shooting had anything to do with gang activity. On cross-examination, defendant was questioned about his involvement in a problem at school two years before the shooting for gang-related expression, but he denied knowledge of the circumstances of the problem.
In closing arguments, the State made brief references to the GMC gang. It argued the shooting was about the GMC boys standing up for one another. In rebuttal, the State argued an innocent child was dead because of defendant's need to protect his street reputation as a GMC member.
The Second Circuit has stated that
[i]n today's society, members of gangs are not regarded as model citizens. There is inherent connotation that a gang member is involved in criminal activity. The fact that [a] defendant was a gang member could . . . create an image of a bad person in the eyes of the jury.[25]
In Barnes, the court determined evidence of the defendant's gang affiliation was prejudicial because the evidence was not relevant to any of the essential elements of the armed robbery. However, the court concluded the error was harmless. It noted there was direct evidence that placed the defendant in possession of items identified as taken in the robbery, items of clothing and a gun described by a witness, and a pantyhose mask similar to the one used in the robbery. Thus, the court determined evidence that the defendant was a gang member did not contribute to his guilty verdict
In State v. Williams,[26] this Court found that the defendant's gang affiliation had independent relevance in establishing the defendant's motive and intent for second-degree murder. This Court referenced Barnes but noted that, unlike armed robbery, second-degree murder is a specific intent crime. This Court explained that the evidence showed the shooting was gang-related and involved a territorial conflict between two rival gangs. This Court concluded evidence of the defendant's gang affiliation was relevant to show his motive to specifically injure the victims, who were affiliated with a rival gang.
In the present case, defendant had been charged with second-degree murder; thus, specific intent was an issue. The State's theory was that the shooting was a result of GMC gang members seeking revenge for an earlier altercation. The gang-related revenge evidence was relevant to show defendant's motive of specific intent to injure. Thus, we find that the admission of such evidence was not improper.
Defendant also asserts that evidence of harassing and threatening phone calls made to the Washington's home was improperly admitted. Weatherspoon claims there was no identification of the caller or how or if the caller was linked to him and also argues that the testimony was irrelevant and highly prejudicial.
Relevant evidence is any "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be *229 without the evidence."[27] Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice.[28] A verdict will not be reversed because of the erroneous admission of irrelevant evidence if the reviewing court determines that the error was harmless beyond a reasonable doubt.[29]
During trial, Deputy Michael Buras, who was a responding officer to the shooting, testified that he was dispatched to the home of Schwanda Washington, Orlando and Brandon's mother, approximately three weeks after the shooting in response to a complaint of harassing phone calls. He stated that Ms. Washington advised she had been receiving threatening phone calls from an unknown person who stated he was going to kill her. Defense counsel objected on the basis of hearsay. The State argued it was res gestae but the trial court did not agree. The State attempted to pursue the questions about the phone calls but abandoned its attempt after defense counsel consistently objected. The State ultimately settled on eliciting information about Ms. Washington's emotional state, which was described by Deputy Buras as traumatized, upset, crying, and worried for her children.
On cross-examination, defense counsel questioned Deputy Buras about the harassing phone calls. Deputy Buras stated the caller never identified himself and neither Orlando nor Brandon Washington heard the phone calls.
The day after Deputy Buras testified, defense counsel objected to all the testimony containing innuendos and references to threats and fear. He argued such testimony was irrelevant and prejudicial because there was nothing identifying defendant as the source of the threats. The objection resulted in a ruling that the tape of Ms. Washington's call to 911 was inadmissible. Thereafter, Ms. Washington testified that her family experienced problems since her sons became involved in the case. Before any specific details were elicited, defense counsel objected on the basis of relevance. The objection was sustained by the trial court.
On appeal, defendant specifically challenges the reference to the threatening phone calls as irrelevant and prejudicial, which is a different ground from his contemporaneous hearsay objection at trial. However, defendant later made clear to the trial court that his objection to evidence of the threatening phone calls was based on relevancy. Generally, to preserve the right to seek appellate review, a party must state an objection contemporaneously with the occurrence of the alleged error as well as the grounds for the objection.[30] A new ground for an objection cannot be presented for the first time on appeal.[31] However, we conclude that the defendant sufficiently raised the issue of relevancy at the trial court level even though it was not clarified until later in trial.
After review, we find that the evidence of the threatening phone calls to the Washington household was irrelevant to the prosecution of defendant for second-degree murder. As pointed out by defendant, there was absolutely no evidence *230 linking the threatening phone calls to defendant. However, we also find that the admission of this irrelevant evidence was harmless. As stated above, the evidence against defendant was overwhelming with four eyewitnesses identifying him as the shooter.
Weatherspoon next asserts that the trial court erred in failing to grant a mistrial when a State witness, Deantre Jackson, testified he took a lie detector test that showed he was not lying about his participation in the shooting or, specifically, that he did not shoot a gun during the incident. Defendant argues that lie detector test results are inadmissible for any purpose and contends that Deantre's reference to the results of his lie detector test required a mistrial. He maintains Deantre's testimony was crucial to the State's case and that his credibility was at issue because he continuously lied to the police in several of his statements. Defendant argues the jury's knowledge of Deantre's lie detector test results impermissibly swayed its opinion that Deantre was credible.
Defendant is correct in his assertion that the results of a polygraph examination are inadmissible for any purpose at a criminal trial.[32] In State v. Legrand, supra, the Louisiana Supreme Court stated that the rule excluding polygraph evidence "operates to prevent any reference during trial to the fact that a witness has taken a polygraph examination with respect to the subject matter of his testimony."[33] The supreme court explained that such evidence is prohibited because it "invites a probable inference by the jury that the witness passed the polygraph examination and therefore is testifying truthfully," thereby usurping the jury's prerogative on a question involving credibility.[34] The supreme court further noted that polygraph information and test results are inadmissible "either as substantive evidence or as relating to the credibility of a party or witness."[35]
An impermissible reference to a polygraph during a criminal trial does not require a reversal unless there is a reasonable possibility that the error complained of might have contributed to the conviction.[36]
Prior to trial, discussions were had between the parties regarding Deantre's polygraph examination. Specifically, defense counsel wanted to ensure that there would be no testimony referencing the polygraph. The prosecutor acknowledged the prohibition against such testimony and stated to the court that he had advised his witnesses against mentioning the polygraph. He even stated he was glad defense counsel was aware of the prohibition so that defense counsel could "tender or tailor his cross-examination accordingly."
At trial, defendant challenged Deantre's credibility by vigorously questioning Deantre, during cross-examination, about the alleged deal he received in exchange for *231 his trial testimony and the inconsistencies in his prior statements and testimony. Deantre testified he was initially charged with murder but pled guilty to manslaughter in juvenile court. He stated he agreed to tell the truth and testify in court against the other three occupants of the vehicle.
During cross-examination, Deantre admitted that he lied in his initial statement to the police and in his testimony at prior court hearings about numerous things relating to the incident. He explained he was young, age 16, and scared and did not want to "rat" on his friends. He also admitted that he lied to protect himself. Examples of his lies included his statement to the police about getting out of the car after the shooting and being picked up by his mother on the street, stating he did not know guns were in the car before the shooting, stating that Troy Porea never got out of the car and did not have a gun, testifying at a prior hearing that he did not see defendant with a gun, and executing an affidavit that contained information that was not true.
After many questions about Deantre's inconsistent statements and testimony, defense counsel turned his focus to the defense's theory that it "paid" Deantre to lie about whether he possessed a gun at the time of the incident. Deantre ultimately responded to defense counsel's questioning by stating he had taken a lie detector test. The following exchange occurred:
Q. Did anybody in that car know Lionel was going to be shot?
A. I don't know. I'm not them. I know I didn't know he was going to get shot.
Q. But you were in a car that you claim was filled with people going out looking for revenge; that's your story today, right?
A. Yes.
Q. And you stayed in that car?
A. Yes.
Q. You didn't get out of the car?
A. No, sir.
Q. And your testimony today is now that you know they all had guns?
A. Yes, sir.
Q. And of course, you're the only one without a gun, aren't you?
A. Yes, sir. I did not have no gun.
Q. And that paid to not have a gun, didn't it?
A. Excuse me?
Q. It paid not to have a gun, didn't it?
A. Yes, it did.
Q. Or at least it paid to say you didn't have a gun?
A. Oh, it paid that I did not have no gun.
Q. It pays both ways, doesn't it?
A. I did not have no gun.
Q. Doesn't it pay both ways?
A. I did not have no gun.
Q. Sir, I asked you
THE COURT:
Answer his question, sir.
[DEFENSE COUNSEL]:
Q. Regardless of whether you had a gun or
[PROSECUTOR]:
Well, I object to the question because I don't understand the question.
[DEFENSE COUNSEL]:
Well, I'll rephrase it.
[DEFENSE COUNSEL]:
Q. Regardless of whether you really had a gun or not, and you really shot or you didn't shoot, it paid to say you didn't have a gun, didn't it?
A. It didif that's what you said it paid, I done went and took lie detector tests
*232 Defense counsel immediately requested to approach the bench where he requested a mistrial out of the jury's hearing. The State argued the response was unintentional and was the result of defense counsel's continued questioning and badgering of the witness. The trial court agreed and denied defendant's request for a mistrial. The trial court offered to admonish the jury but defense counsel expressed reluctance to an admonishment and the trial court ultimately refrained from such action.
Before cross-examination resumed, the trial court instructed Deantre, outside the jury's presence, not to mention the polygraph test. Deantre stated he did not remember being previously instructed not to talk about the polygraph test. The polygraph was not mentioned at any other time during the six-day trial.[37]
In State v. Matthews,[38] the supreme court did not find reversible error when the victim of an armed robbery testified that he had taken a lie detector test. At trial, defense counsel questioned the victim about inconsistencies between his trial testimony and earlier testimony he had given at a motion to suppress hearing. In the course of explaining the inconsistency, the victim stated he was confused with another incident where he was unable to identify anyone from photographs. He then mentioned, in referencing the other incident, that he had taken a lie detector test. Defense counsel argued the victim tried to bolster the veracity of his testimony by referencing the lie detector test and that it severely prejudiced him because there was some doubt a robbery occurred. The supreme court disagreed finding there was no doubt a robbery had taken place and found the defendant was not prejudiced by the victim's gratuitous remark referencing the lie detector test.
Also, in State v. Legrand,[39] no reversible error was found in the sentencing phase of trial despite the State's principal witness testifying he had passed a polygraph examination and despite the fact no admonishment was given to the jury. The witness testified he had been arrested for being an accessory after the fact to murder but had pled guilty to a reduced charge and had yet to be sentenced. He also admitted having other pending charges that had yet to be resolved. Defense counsel questioned the witness in an attempt to establish he was altering parts of his testimony in order to receive favorable treatment in his own case. In response to the vigorous questioning, the witness stated the reduced charge was offered after he took a polygraph test, which revealed he was telling the truth about not participating in the killing of the victim.
The Louisiana Supreme Court noted that the witness' mention of the polygraph test was in response to the defense attorney repeatedly asking him about the fact less serious charges were accepted by the State. The supreme court observed that the witness simply offered what he believed *233 to be the reason the charges against him were lessened. The court also found that the witness' full response, that he was telling the truth in that he did not help the defendant kill the victim, clarified that the polygraph related only to the witness' lack of participation in the murder, which was not a fact genuinely at issue.
Furthermore, the supreme court found the witness' testimony was far from the only evidence of the defendant's guilt and noted that the other evidence was overwhelming. The court noted the remarks about the polygraph exam were made during the sentencing phase and concluded that any error was harmless because of the overwhelming evidence of the defendant's guilt.
In the present case, as in Legrand, Deantre's remark that he had taken a polygraph test was in response to defense counsel's relentless attempt to establish Deantre lied about his involvement in the incident in order to broker a plea agreement with the State. Deantre's reference to the polygraph test was his attempt to explain why he believed he did not receive a "deal" in exchange for his testimony against defendant: the fact he did not possess a gun during the incident.
Whether Deantre was armed at the time of the incident was challenged by defendant who testified that Deantre was one of the shooters. However, none of the other evidence suggested Deantre was armed at the time of the incident. None of the three eyewitnesses to the shooting identified Deantre as one of the shooters. In fact, Brandon Washington specifically testified that he saw Deantre in the car but that he did not see Deantre get out of the car and shoot. Thus, that portion of Deantre's testimony about not possessing a gun at the time of the shooting was corroborated by other evidence and his reference to taking a polygraph examination in connection with that fact was not prejudicial to defendant.
Because of the overwhelming evidence of defendant's guilt, it cannot be said that any remarks about the polygraph examination might have contributed to defendant's conviction. Therefore, we find that trial court properly denied defendant's motion for a mistrial.
Next, Weatherspoon argues that his thirty-five-year sentence for manslaughter is excessive considering his youthful age of sixteen at the time of the shooting, his seventh grade education, and his low IQ, which is considered borderline mildly retarded. He contends the trial court failed to give adequate weight to mitigating factors by failing to consider his mental status, which included attention deficit disorder and oppositional defiant disorder. Defendant also asserts the trial court failed to consider the various medications he was taking, his history of marijuana abuse, and the fact he repeated seventh grade three times.
It is noted that defendant failed to orally object to his sentence or file a motion for reconsideration of sentence as required by LSA-C.Cr.P. art. 881.1.[40] Defendant's failure to object to his sentence or to move for reconsideration of his sentence limits him to a bare review of the sentence for constitutional excessiveness on appeal.[41]
*234 The Eighth Amendment to the United States Constitution and Article I, § 20 of the Louisiana Constitution prohibit the imposition of excessive punishment. A sentence is considered excessive, even when it is within the applicable statutory range, if it is grossly disproportionate to the offense or imposes needless and purposeless pain and suffering.[42]
In reviewing a sentence for excessiveness, the appellate court must consider the punishment and the crime in light of the harm to society and gauge whether the penalty is so disproportionate as to shock our sense of justice. The trial judge is afforded wide discretion in determining sentence, and the court of appeal will not set aside a sentence for excessiveness if the record supports the sentence imposed.[43] The issue on appeal is whether the trial court abused its discretion, not whether another sentence might have been more appropriate.[44] In reviewing a trial court's sentencing discretion, three factors are considered: 1) the nature of the crime, 2) the nature and background of the offender, and 3) the sentence imposed for similar crimes by the same court and other courts.[45] There is no requirement that specific matters be given any particular weight at sentencing.[46]
Weatherspoon was convicted of manslaughter, which is punishable by not more than forty years.[47] Defendant received a near maximum sentence of thirty-five years. At his sentencing hearing, defendant presented the testimony of Dr. Christine Powanda, a psychologist, who had evaluated defendant one year before the shooting in connection with his involvement with juvenile court and for trouble in school and at home. Dr. Powanda stated she had no independent recollection of defendant and that, other than her report, she had no notes or tests to review. She testified she had no knowledge of defendant's behavior since his April 2001 evaluation and was unaware of his pending charge.
Dr. Powanda testified she had diagnosed defendant with attention deficit disorder (ADD) and oppositional defiant disorder. She stated defendant's verbal IQ was 73, which is borderline intelligence, and his performance IQ was 52, which was within the range for mild mental retardation. Dr. Powanda stated defendant's overall IQ was 60, which put him within the mild range of mental retardation. She explained defendant had a problem with impulse control during the evaluation, which could have affected the results of his IQ tests. She also stated that defendant's effort level during the evaluation was fair and that he was probably capable of doing better. Dr. Powanda testified defendant's school records showed he was placed in regular classes but noted placement in special education varies from school to school. She could not answer whether there is a correlation between a low IQ and behavioral problems.
In addition to Dr. Powanda's testimony, the trial court heard statements from the victim's mother and grandmother. When sentencing defendant, the trial judge expressed *235 her concerns with Dr. Powanda's testimony. She noted Dr. Powanda did not remember defendant, did not remember much about the evaluation, and had no notes pertaining to the evaluation except her brief report. The trial judge further noted Dr. Powanda's evaluation was conducted in a span of two and a half to three and a half hours and that Dr. Powanda herself thought defendant's IQ was probably higher than the report reflected. The trial judge also noted the fact defendant was not placed in special education classes within the school system. The trial judge further noted defendant handled himself extremely well at trial, "both as a result of the direct and of the cross-examination, better than anyone I can imagine who perhaps has an IQ of 65 or 55. He was almost well spoken."
In imposing the thirty-five-year sentence, the trial judge specifically considered defendant's age of sixteen but stated she was concerned that he committed the present offense at such a youthful age. She questioned whether society could expect worse offenses from defendant as he grew older. The trial judge ultimately focused on the death of the victim, stating he was a child who would never be able to grow up.
In State v. Bowman,[48] the Fourth Circuit upheld a thirty-three-year sentence for a sixteen-year-old defendant who was convicted of manslaughter. The defendant, a first-time offender, had been charged with second-degree murder as a principal in a drive-by shooting in which the defendant drove the vehicle from which the fatal shot was fired. The Fourth Circuit found the trial court specifically considered several mitigating factors, including the defendant's age, the fact he was a principal to the crime, and the fact the jury returned a responsive verdict, which reflected the reduced culpability of the defendant. Noting that the defendant was a principal to a drive-by shooting that resulted in the death of one person and that the shooting occurred without any provocation, the court did not find the thirty-three-year sentence to be excessive.
In State v. King,[49] the Second Circuit upheld the defendant's sixty-five-year sentence for manslaughter as a second felony offender despite the defendant's claim he had diminished mental ability. The Second Circuit noted that the trial court considered the defendant's youth and mild mental retardation as mitigating circumstances but that it ultimately focused on the "horror" of the crime, which involved a victim whose skull had been fractured, who had been stabbed over 60 times, and who was left lying in a pool of blood with a knife protruding from his neck. As for the defendant's claim of mild mental retardation, the trial court had noted that the defendant's limited mental ability did not prevent him from making misleading statements to police to avoid telling them what happened at the victim's apartment on the night of the killing. The Second Circuit found the trial court did not abuse its discretion in sentencing based on the factual circumstances of the case.
In the present case, defendant was initially charged with second-degree murder and was convicted of manslaughter in the shooting death of a fourteen-year-old boy. The record shows the shooting was provoked by an object hitting the car in which defendant was riding. Defendant exited the car and fired several shots into a crowd of people with no regard for human *236 life. Despite defendant's youthful age, he had a criminal history consisting of a juvenile adjudication for aggravated assault involving an incident with a knife and his mother. Additionally, based on the evidence presented, defendant's alleged diminished mental ability was questionable.
Based on the circumstances, we cannot find that the trial court abused its discretion in imposing a thirty-five-year sentence despite defendant's youthfulness and his alleged diminished mental ability. The imposed sentence is neither grossly disproportionate to the severity of the offense nor shocking to our sense of justice.
The record was reviewed for errors patent, according to LSA-C.Cr.P. art. 920; State v. Oliveaux,[50] and State v. Weiland.[51] The following matters are noted:
There is an inconsistency between the transcript and the commitment with regard to sentencing. The commitment indicates defendant was sentenced to thirty-five years at hard labor but the transcript reflects the trial judge failed to state that the sentence was to be served at "hard labor." The transcript prevails when there is a discrepancy between the commitment and the transcript.[52] LSA-C.Cr.P. art. 879 requires a court to impose a determinate sentence. If there was some discretion allowed by the applicable sentencing statute, the failure to indicate whether the sentence was to be served at "hard labor" would be an impermissible indeterminate sentence.[53] However, since defendant was sentenced pursuant to LSA-R.S. 14:31, which requires the sentence be served at hard labor, the sentence is determinate and the failure to state such is harmless error.[54]
Also, it is noted that defendant was advised of the two-year prescriptive period for filing an application for post-conviction relief after he was sentenced on an unrelated guilty plea that he immediately tendered following his sentencing for his manslaughter conviction. We find this to be sufficient notice to satisfy the requirements of LSA-C.Cr.P. art. 930.8.
Accordingly, for the foregoing reasons, the defendant's conviction and sentence are affirmed.
AFFIRMED.
NOTES
[1] Troy Porea was also charged with second-degree murder in the indictment but the parties were severed and defendant proceeded to a separate trial.
[2] Defendant's assignments of error are addressed out of order so the sufficiency of the evidence is addressed first in accordance with State v. Hearold, 603 So.2d 731, 734 (La. 1992). In Hearold, the Louisiana Supreme Court stated that, when the issues on appeal relate to both sufficiency of the evidence and one or more trial errors, the reviewing court should first determine the sufficiency of the evidence. The rationale is that, when the entirety of the evidence, including evidence erroneously admitted, is insufficient to support the defendant's conviction, the defendant must be discharged as to that crime, and any issues regarding trial errors become moot. State v. Hensley, 04-617 (La.App. 5 Cir. 3/1/05), 900 So.2d 1, 6, writ denied, 05-0823 (La.6/17/05), 904 So.2d 683.
[3] Although a motion for post-verdict judgment of acquittal was not filed by defendant in this case, the Louisiana Supreme Court has recognized that the issue of sufficiency of the evidence is properly reviewed on appeal even in the absence of a motion for post-verdict judgment of acquittal. See, State v. Marcantel, 00-1629 (La.4/3/02), 815 So.2d 50, 56, fn. 2; State v. Hensley, 04-617 (La.App. 5 Cir. 3/1/05), 900 So.2d 1, 6, fn. 1, writ denied, 05-0823 (La.6/17/05), 904 So.2d 683.
[4] Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979).
[5] State v. Ingram, 04-551 (La.App. 5 Cir. 10/26/04), 888 So.2d 923, 926.
[6] Id.
[7] State v. King, 05-553 (La.App. 5 Cir. 1/31/06), 922 So.2d 1207, 1212.
[8] Orlando and Brandon Washington are cousins to Brandon Walker and Troy Porea.
[9] In his testimony, Orlando identifies Jamal only by his first name. A review of the record reveals Jamal's last name is Jamal Taylor.
[10] Deantre had been arrested for possession of cocaine and theft of a firearm.
[11] State v. Bailey, 04-85 (La.App. 5 Cir. 5/26/04), 875 So.2d 949, 955, writ denied, 04-1605 (La.11/15/04), 887 So.2d 476.
[12] Id.
[13] 05-251 (La.App. 5 Cir. 1/17/06), 921 So.2d 1066.
[14] 05-169 (La.App. 5 Cir. 11/29/05), 917 So.2d 600.
[15] LSA-C.E. art. 404B(1); State v. Prieur, 277 So.2d 126, 128 (La.1973).
[16] State v. Dauzart, 02-1187 (La.App. 5 Cir. 3/25/03), 844 So.2d 159, 165.
[17] LSA-C.E. art. 404(B)(1); Id.
[18] State v. Jackson, 93-0424 (La.10/18/93), 625 So.2d 146, 149.
[19] LSA-C.E. art. 403.
[20] State v. Dauzart, supra at 165-66 (citation omitted).
[21] State v. Williams, 02-645 (La.App. 5 Cir. 11/26/02), 833 So.2d 497, 507, writ denied, 02-3182 (La.4/25/03), 842 So.2d 398.
[22] Id.
[23] GMC refers to the three streets, Garden, Marshall, and Carmadelle, where many of the gang members live.
[24] Defense counsel again objected to the testimony relating to the GMC gang.
[25] State v. Barnes, 28,835 (La.App. 2 Cir. 12/11/96), 685 So.2d 1148, 1155.
[26] 02-645 (La.App. 5 Cir. 11/26/02), 833 So.2d 497, writ denied, 02-3182 (La.4/25/03), 842 So.2d 398.
[27] LSA-C.E. art. 401.
[28] LSA-C.E. art. 403.
[29] State v. Wright, 04-1038 (La.App. 5 Cir. 2/15/05), 896 So.2d 1172, 1179.
[30] LSA-C.Cr.P. art. 841.
[31] State v. Gaal, 01-376 (La.App. 5 Cir. 10/17/01), 800 So.2d 938, 949-50, writ denied, 02-2335 (La.10/3/03), 855 So.2d 294.
[32] See, State v. Legrand, 02-1462 (La.12/3/03), 864 So.2d 89, 98, cert. denied, 544 U.S. 947, 125 S.Ct. 1692, 161 L.Ed.2d 523 (2005).
[33] State v. Legrand, supra, citing State v. Hocum, 456 So.2d 602, 604 (La.1984); State v. Tonubbee, 420 So.2d 126, 132 (La.1982), cert. denied, 460 U.S. 1081, 103 S.Ct. 1768, 76 L.Ed.2d 342 (1983); State v. Davis, 407 So.2d 702, 706 (La.1981); State v. Catanese, 368 So.2d 975, 981 (La.1979).
[34] Id., quoting State v. Hocum, 456 So.2d 602, 604-05 (La.1984); State v. Davis, 407 So.2d 702, 706 (La.1981).
[35] State v. Legrand, supra at 98, quoting State v. Humphrey, 445 So.2d 1155, 1158 (La. 1984).
[36] State v. Legrand, supra at 98.
[37] Of note, Lieutenant Dennis Thornton testified that "other steps" were taken to verify that Deantre was telling the truth prior to allowing him to plead. Defense counsel immediately requested a bench conference wherein he expressed his "problem" with the current line of questioning. An accord was seemingly reached when the prosecutor agreed to relate the reference to "other steps" to the photo lineup of Deantre that was shown to Brandon Walker, who identified Deantre as an occupant of the vehicle but stated Deantre did not exit or shoot into the crowd. Defendant does not challenge this testimony on appeal.
[38] 322 So.2d 159 (La.1975).
[39] 02-1462 (La.12/3/03), 864 So.2d 89, cert. denied, 544 U.S. 947, 125 S.Ct. 1692, 161 L.Ed.2d 523, (2005).
[40] LSA-C.Cr.P. art. 881.1(E) provides, "Failure to make or file a motion to reconsider sentence or to include a specific ground upon which a motion to reconsider sentence may be based, including a claim of excessiveness, shall preclude . . . the defendant from raising an objection to the sentence or from urging any ground not raised in the motion on appeal or review."
[41] State v. Hebert, 05-1004 (La.App. 5 Cir. 4/25/06), 930 So.2d 1039, 1049.
[42] State v. Wickem, 99-1261 (La.App. 5 Cir. 4/12/00), 759 So.2d 961, 968, writ denied, 00-1371 (La.2/16/01), 785 So.2d 839.
[43] State v. Brown, 04-230 (La.App. 5 Cir. 7/27/04), 880 So.2d 899, 902.
[44] Id.
[45] Id.
[46] State v. Magee, 05-171 (La.App. 5 Cir. 10/6/05), 916 So.2d 1178, 1185, writs denied, 06-0461 and 06-0464 (La.9/22/06), 937 So.2d 377.
[47] LSA-R.S. 14:31.
[48] 95-667 (La.App. 4 Cir. 7/10/96), 677 So.2d 1094, 1101-02, writ denied, 96-2070 (La.1/31/97), 687 So.2d 400.
[49] 41,084 (La.App. 2 Cir. 6/30/06), 935 So.2d 815, 826.
[50] 312 So.2d 337 (La.1975).
[51] 556 So.2d 175 (La.App. 5 Cir.1990).
[52] State v. Lynch, 441 So.2d 732 (La.1983).
[53] State v. Norman, 05-794 (La.App. 5 Cir. 3/14/06), 926 So.2d 657, 661.
[54] Id.