956 So.2d 823 (2007)
STATE of Louisiana, Appellee,
v.
Melecia a/k/a Lecia FRANKLIN, Appellant.
No. 42,055-KA.
Court of Appeal of Louisiana, Second Circuit.
May 9, 2007.
Opinion Denying Rehearing June 14, 2007.
*827 Dmitrc I. Burnes, Alexandria, for Appellant.
Jerry Jones, District Attorney, Neal G. Johnson, Assistant District Attorney, for Appellee.
*828 Before WILLIAMS, PEATROSS & MOORE, JJ.
PEATROSS, J.
Defendant, Melecia (aka Lecia) Franklin, was convicted of two counts of forgery and one count of felony theft. On each count of forgery, she was sentenced to serve two years' imprisonment at hard labor, to run concurrently. For felony theft, Defendant was sentenced to serve seven years' imprisonment at hard labor, to run consecutively with counts one and two, which was suspended. She was placed on five years' supervised probation and ordered to make restitution. Defendant now appeals. For the reasons stated herein, Defendant's convictions and sentences are affirmed.

FACTS
Defendant had been working as an employee of the Sterlington Branch of Cross Keys Bank, Ouachita Parish, and its predecessor, Sterlington Bank, since about 1981. In 2003, Defendant was vault teller, which was equivalent to second-in-charge of the branch. She was responsible for all of the money that came in and out of the bank, supervising the other tellers and balancing her teller station and the vault on a daily basis. As vault teller, it was Defendant's customary practice when a teller was short as little as $5 to search the entire bank until the shortage was resolved. She was considered a highly-trusted employee.
Defendant had not taken any of the time allotted for her annual vacation as of the middle of December 2003, which was unusual. On Friday, December 12, 2003, however, both Defendant and the assistant vault teller, Terri Smith, had scheduled to take the day off work to travel with their respective families to New Orleans to watch the local high school football team participate in the playoffs. In preparation for the absences, Defendant selected her niece, Hillary Dupree, to be in charge of the vault. Ms. Dupree was a loan clerk who occasionally did teller work and knew how to balance her teller station. Defendant showed Ms. Dupree how to balance the vault by using the totals from the general ledger cash book entry for the previous day as her basis and then adding the subsequent "cash-in" items and subtracting the subsequent "cash-out" items.
At the close of the day on Friday, December 12, Ms. Dupree informed the branch manager, Johnny James, that the vault was out of balanceat first there was a shortage of $6,500, and later an additional $100,000 shortage was discovered. Ms. Dupree called Defendant on her cell phone in New Orleans and advised her of the initial $6,500 shortage. Defendant, who was apparently irritated at being contacted while she was trying to check in at the hotel, told Ms. Dupree that she would address the problem when she returned to work on Monday. When the additional shortage of $100,000 was discovered later that afternoon, another teller, Rhonda George, attempted to contact Defendant on her cell phone. Finally, Ms. Dupree detected what she thought was the cause of the $100,000 discrepancythat she did not bring the correct balance forward from the previous day. Ms. George then called Defendant's daughter's cell phone and left a voice message that the $100,000 discrepancy had been resolved. The $6,500 discrepancy was not resolvedMs. Dupree and Ms. George decided to take the matter up with Defendant on Monday.
At about 8:30 a.m. on Monday, December 15, 2003, Defendant arrived for work at the bank and went straight into Mr. James' office. She was accompanied by her sister, Teresa Norman. Defendant admitted to Mr. James that $120,000 had *829 been missing from the vault since September 5. Mr. James suggested that Defendant go home while he called the main office in St. Joseph to report the shortage and he would call her to return when the bank officials arrived. Defendant, however, said she and her sister would wait for the officials at the bank. Defendant was seen behind the teller windows in the interim.
At about 11:00 a.m., three main office bank officials arrived, namely Jack Grace, Executive Vice President, Michael Vizzard, Senior Vice President, and Linda Keahy, Cashier. Defendant joined Mr. Grace in the vault and explained what happened on September 5. She related that, while she was inside the vault, she took some money out of the small vault and moved it over on the top of the safety deposit boxes in the outer room of the vault. Defendant related that she was counting the money when she got a phone call that her sister was very sick. Defendant told Mr. Grace that she "went to pieces" after learning about her sister's illness. She said that she did not know what happened to the money after that, but asserted that she did not take it. Defendant speculated that it might have accidentally been thrown away in some of the boxes that were on the cluttered floor. She related that the denominations were $80,000 in hundreds and $40,000 in twenties. Defendant offered no explanation why she waited 101 days to report the $120,000 shortage.
Ms. Keahy had previously audited the branch in July 2003 and balanced Defendant's teller station and vault to a total shortage of about $64.25. On the morning of December 15, Ms. Keahy counted the cash in the vault, compared it to the general ledger and determined that there was indeed a shortage of $120,010. It was also determined that the drawer to Defendant's teller station, which was kept inside the vault during her absence on Friday, December 12, was over by approximately $500. Included in Defendant's teller station records were "cash out" items for two savings accounts withdrawals and a "cash in" for $10,000, representing money Defendant moved from the vault to her teller station. Both Ms. Dupree and Ms. George later denied taking the $120,000 from the bank.
While the vault was being counted, Defendant voluntarily met with Mr. Grace and Mr. Vizzard in the break room and answered questions regarding the shortage. Mr. Grace asked why Defendant had waited so long to notify the bank of such a sizable shortage. Initially, Defendant continued in her assertion that she did not know what happened to the money other than the shortage occurred in September and she did not take it.
At Mr. Grace's request, Mr. Vizzard left the break room to supervise the vault count. It was after Mr. Vizzard left the room that Defendant told Mr. Grace that she has a 14-year-old daughter and did not want to go to jail. She asked what would happen if she admitted taking the money. Mr. Grace told Defendant that he could not make any promises or bargains, but asked her to "think real hard" whether she really took the money. He suggested that making restitution would be helpful, but was not required. Defendant then admitted that she had taken the money.
Mr. Vizzard returned to the break room at Mr. Grace's request. It was then that Defendant admitted to both Mr. Grace and Mr. Vizzard that she took the money in increments and spent it all. She refused, however, to sign a written confession. Before leaving the bank shortly after 1:00 p.m., Defendant told Mr. James that she was sorry. She was allowed to return later that afternoon after the bank closed to say goodbye to her co-workers and collect *830 her belongings. Defendant was fired from her job and Mr. Vizzard reported the loss to Kansas Bankers Surety Company, the bank's bonding company. The bank was responsible for a deductible or self-insured portion of the loss under that bonding agreement.
On January 6, 2004, Mrs. Lillian Green, an elderly and long-time customer, contacted Ms. Dupree at the bank and advised that she had just reviewed her savings account statement. She noticed a withdrawal from that account in the amount of $5,500 dated December 15, 2003, that she did not make or authorize. Ms. Dupree checked a proof image of the withdrawal slip and knew immediately that the signature on the slip was not the signature of Mrs. Green. Ms. Dupree recognized the numbers on the withdrawal slip as written in Defendant's handwriting. Further examination revealed that the adjacent transaction appeared suspicious. It was a withdrawal from the savings account of Mrs. Willie Smithanother elderly and long-time customerin the amount of $9,550 dated October 15, 2003. Ms. Dupree noted that the signature on the withdrawal slip did not look like Mrs. Smith's, and the numbers were written in Defendant's handwriting.
Ms. George also recognized the signatures on the withdrawal slips as written in Defendant's handwriting and did not remember seeing either customer in the bank on that day. She thought it was unusual to have withdrawal slips on these two customers. Both withdrawals were made at Defendant's teller station and were stamped as processed by the teller on December 15. The withdrawals created "cash out" items for Defendant's teller station for a total of $9,550. It was determined that those were the only withdrawals made on both accounts during the entire year of 2003. The bank later returned the money to both accounts. Another teller, Simona Deere, also could not remember seeing either customer in the bank on December 15. She related that it was not unusual for a teller to fill out a withdrawal slip with the date, account number and amount, but it would then be handed to the customer for his or her signature.
According to Ms. Keahy and Ms. George, the effect of the withdrawals was to decrease the balances in both victims' savings accounts. Mr. Grace opined that the withdrawals created "cash out" entries from Defendant's teller station that decreased the shortage in the vault even if no currency was removed from the bank on December 15. As a result of the withdrawals, the vault shortage was $120,010 (instead of approximately $135,000). Mr. Grace did not believe that Defendant actually took cash out of the bank on December 15. Mr. Grace further opined that the withdrawals must have been made by Defendant before his arrival at the bank at 11:00 a.m. on December 15 because Defendant was in his continual presence from that time until she left the bank at about 1:00 p.m. An expert in handwriting analysis determined that withdrawal slips were indeed written in Defendant's handwriting. Both Mrs. Green and Mrs. Smith knew and liked Defendant, but denied ever calling the bank and authorizing the savings withdrawals.
Defendant was charged by bill of information with two counts of forgery occurring on or about December 15, 2003. Before trial, the bill was amended to include a third count of felony theft of currency having a value of $120,000 occurring between September 1, 2003, and December 31, 2003. At trial, evidence supporting the facts and circumstances related herein was adduced by the State. Just prior to resting its case, the State called the branch's current vault teller, Terry Smith, who testified *831 that, according to bank records, Defendant and her husband had a safety deposit box at the bank branch. She related that a bank employee was not necessarily required to sign the bank's safety deposit record book to access his or her box if that employee had access to the master key and their own key. The bank's record book showed that Defendant accessed her box in June 2004 after she was no longer a bank employee  it was the only entry into Defendant's safety deposit box recorded in the book since 1989. The record also showed that no customers accessed their safety deposit boxes on Friday, December 12 or Monday, December 15. Ms. Smith testified on cross-examination that she knew Ms. Deere and Ms. Dupree had safety deposit boxes at the branch, but did not know whether Ms. George had one. It was also brought out that there were empty safe deposit boxes, the keys to which were probably in a box inside the vault. She further testified that she did not have a safety deposit box.
The defense presented testimony by several witnesses, including Defendant's husband, daughter, sister and mother. Specifically, Defendant's husband outlined his work and financial history and related that he was able to support his family and pay the bills. He stated that the family did not have financial troubles and he would have noticed if Defendant had been accessing $120,000. Defendant's daughter also testified that there was nothing in Defendant's lifestyle that would indicate she had been spending $120,000 and that she and Defendant were always together.
Defendant testified at trial on her own behalf. She stated that on August 28, 2003, she wrote an order to the Federal Reserve for $80,000 in currency. When the order arrived at the Sterlington Branch she placed the money in the cash closet inside the bank vault. She added $40,000 to the bag containing the $80,000 order. Defendant related that on Friday, September 5, she was working in the vault and took the money into the lockbox area to break it down into the denominations used by the branch. Meanwhile, Defendant received a phone call that her sister was sick. She became very upset and started crying. Defendant related that she forgot about the money. It was not until she counted the vault on the following Monday that she realized that $120,000 was missing. Defendant stated that she did not report the shortage because "she just froze on it" and hoped the money would reappear. She, however, admitted falsifying the ledger entries to reflect that the money was in the vault and keeping quiet about the shortage.
Defendant related that she had decided to tell Mr. James about the shortage on Monday, December 15. She told only her sister about the problem on Sunday and her sister insisted that she accompany her to the bank. Defendant met her sister at the bank early that Monday morning. When Mr. James arrived, they went into his office and Defendant told him what had happened on September 5 and about the shortage. Defendant related that Mr. James suggested that she go home until the bank officials arrived, but she said she would rather wait at the bank.
According to Defendant, she helped some customers at her teller station that Monday morning even though she was nervous and distracted. She testified that she received two different phone calls from customers claiming to be Mrs. Smith and Mrs. Green. Each requested that Defendant prepare a savings withdrawal from their accounts and stated that they would come by later to pick up the funds. Defendant acknowledged that she filled out the withdrawal slips and signed the customers' signatures on those slips. She *832 asserted that she placed the withdrawals inside her teller window. According to Defendant, the customers did not come into the bank while she was there that morning, so she never processed those transactions. She admitted that she had a safety deposit box at the bank, but listed the other employees who also had boxes and related that employees accessed their boxes without signing the record book. Notably, Defendant denied ever confessing that she took money.
Following a trial before a six-person jury, Defendant was found guilty on all three counts. The defense's post-trial motions to present polygraph examination evidence and for a new trial were heard and denied. A hearing on the State's motion to set restitution was held.
At the sentencing hearing on August 7, 2006, the trial court stated that it had reviewed the pre-sentence investigation report as well as the letters submitted on Defendant's behalf. It noted that there were, in fact, three victims of these crimes, Mrs. Green, Mrs. Smith and the bank. The trial court meticulously set forth reasons for sentencing as per La. C. Cr. P. art. 894.1. Thereafter, Defendant was sentenced as follows: Count one (forgery)two years' imprisonment at hard labor with credit for time served; Count two (forgery)two years' imprisonment at hard labor with credit for time served to run concurrently with the sentence for count one; Count three (felony theft) seven years' imprisonment at hard labor, to run consecutively with the sentences for counts one and two. Defendant was ordered to pay court costs within 60 days or in default serve 90 days in the parish jail. Execution of the seven-year sentence was suspended and Defendant was placed on five years' supervised probation to commence upon expiration of parole or good time supervision and to run consecutively to other probationary periods. She was ordered to make restitution in Count three to Cross Keys Bank in the amount of $25,000, and $94,950 to Kansas Bankers Surety Company for a total of $119,950, payable at $2,000 each month for 59 months with the last payment of $1,950 due and payable on the 60th month commencing upon expiration of parole or good time supervision. The court stated that restitution in Counts one and two in the amount of $15,050 will be determined by the Department of Probation and Parole. Defendant's timely filed motion to reconsider sentence was denied. This appeal followed.

DISCUSSION
Assignments of Error Numbers One, Two and Five: Sufficiency of the Evidence and denial of Motion for New Trial
Although the record does not reflect that Defendant filed a motion for post-verdict judgment of acquittal pursuant to La. C. Cr. P. art. 821, this court will consider sufficiency arguments in the absence of such a motion. State v. Henson, 38,820 (La.App.2d Cir.9/22/04), 882 So.2d 670; State v. Green, 28,994 (La.App.2d Cir.2/26/97), 691 So.2d 1273.
When issues are raised on appeal, both as to the sufficiency of the evidence and as to one or more trial errors, the reviewing court should first determine the sufficiency of the evidence. The reason for reviewing sufficiency first is that the accused may be entitled to an acquittal under Hudson v. Louisiana, 450 U.S. 40, 101 S.Ct. 970, 67 L.Ed.2d 30 (1981), if a rational trier of fact, viewing the evidence in accord with Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), in the light most favorable to the prosecution, could not reasonably conclude that all of the elements of the offense have *833 been proved beyond a reasonable doubt. State v. Hearold, 603 So.2d 731 (La.1992); State v. Bosley, 29,253 (La.App.2d Cir.4/2/97), 691 So.2d 347, writ denied, 97-1203 (La.10/17/97), 701 So.2d 1333.
This standard, now legislatively embodied in La. C. Cr. P. art. 821, does not provide the appellate court with a vehicle to substitute its own appreciation of the evidence for that of the fact finder. State v. Pigford, 05-0477 (La.2/22/06), 922 So.2d 517; State v. Robertson, 96-1048 (La.10/4/96), 680 So.2d 1165. The appellate court does not assess the credibility of witnesses or reweigh evidence. State v. Smith, 94-3116 (La.10/16/95), 661 So.2d 442. A reviewing court accords great deference to a jury's decision to accept or reject the testimony of a witness in whole or in part. State v. Gilliam, 36,118 (La. App.2d Cir.8/30/02), 827 So.2d 508, writ denied, 02-3090 (La.11/14/03), 858 So.2d 422.
The Jackson standard is applicable in cases involving both direct and circumstantial evidence. An appellate court reviewing the sufficiency of evidence in such cases must resolve any conflict in the direct evidence by viewing that evidence in the light most favorable to the prosecution. When the direct evidence is thus viewed, the facts established by the direct evidence and inferred from the circumstances established by that evidence must be sufficient for a rational trier of fact to conclude beyond a reasonable doubt that the defendant was guilty of every essential element of the crime. State v. Sutton, 436 So.2d 471 (La.1983); State v. Owens, 30,903 (La. App.2d Cir.9/25/98), 719 So.2d 610, writ denied, 98-2723 (La.2/5/99), 737 So.2d 747.
When circumstantial evidence forms the basis for the conviction, such evidence must exclude every reasonable hypothesis of innocence. La. R.S. 15:438. The court does not determine whether another possible hypothesis suggested by the defendant could afford an exculpatory explanation of the events; rather, when evaluating the evidence in the light most favorable to the prosecution, the court determines whether the possible alternative hypothesis is sufficiently reasonable that a rational juror could not have found proof of guilt beyond a reasonable doubt under Jackson v. Virginia. State v. Davis, 92-1623 (La.5/23/94), 637 So.2d 1012, cert. denied, 513 U.S. 975, 115 S.Ct. 450, 130 L.Ed.2d 359 (1994); State v. Owens, supra.
Where there is conflicting testimony about factual matters, the resolution of which depends upon a determination of the credibility of the witnesses, the matter is one of the weight of the evidence, not its sufficiency. State v. Allen, 36,180 (La. App.2d Cir.9/18/02), 828 So.2d 622, writs denied, 02-2595 (La.3/28/03), 840 So.2d 566 and 02-2997 (La.6/27/03), 847 So.2d 1255, cert. denied, 540 U.S. 1185, 124 S.Ct. 1404, 158 L.Ed.2d 90 (2004).

Forgery
La. R.S. 14:72 provides, in pertinent part:
A. It shall be unlawful to forge, with intent to defraud, any signature to, or any part of, any writing purporting to have legal efficacy.[1]
B. Issuing, transferring, or possessing with intent to defraud, a forged writing, known by the offender to be a forged *834 writing, shall also constitute a violation of the provisions of this Section.
C. For purposes of this Section:
(1) "Forge" means the following:
(a) To alter, make, complete, execute, or authenticate any writing so that it purports:
(i) To be the act of another who did not authorize that act;
(ii) To have been executed at a time or place or in a numbered sequence other than was in fact the case; or
(iii) To be a copy of an original when no such original existed.
(b) To issue, transfer, register the transfer of, pass, publish, or otherwise utter a writing that is forged in accordance with the meaning of Subparagraph (1)(a).
(c) To possess a writing that is forged within the meaning of Subparagraph (1)(a).
(2) "Writing" means the following:
(a) Printing or any other method of recording information;
(b) Money, coins, tokens, stamps, seals, credit cards, badges, and trademarks; and
(c) Symbols of value, right, privilege, or identification.
"[I]t is the forging (or transferring) with a concomitant state of mind, intent to defraud, which is proscribed by R.S. 14:72. The sole act constituting the offense in each case is rather singular in nature. In the contemplation of the statute the exclusive act constituting the offense occurs when the forging or transferring takes place." State v. Frank, 355 So.2d 912 (La.1978); State v. Satchfield, 35,631 (La.App.2d Cir.8/14/02), 824 So.2d 537.
In a prosecution for forgery, the state is not required to prove that the defendant intended to defraud a specific person. Instead, the state is "only required to prove that the defendant intended to defraud someone." State v. Watkins, 532 So.2d 1187 (La.App. 1st Cir.1988). "The criminal intent required for forgery is to defraud any person, and it suffices if the forged instrument has prejudiced or might prejudice the rights of another. Moreover, specific intent is a state of mind and need not be proved as a fact but may be inferred from the circumstances and transactions of the case." State v. Satchfield, supra; State v. Fraley, 499 So.2d 1304 (La.App. 4th Cir.1986), writ granted in part on other grounds, 512 So.2d 856 (La.1987) (citations omitted).
Regarding her convictions on the two forgery counts in the case sub judice, Defendant argues that she testified that she filled out the savings withdrawal slips at the express instructions and request of the customers involved. Defendant contends that the State failed to prove that she took cash from the bank in connection with those withdrawal slips. She further contends that no evidence was adduced to show how the withdrawal slips could balance to the figures obtained during the December 15, 2003 audit. In absence of direct evidence that she actually took the funds involved, Defendant asserts that the case is supported only by circumstantial evidence and the State failed to exclude every reasonable hypothesis of innocence. According to Defendant, therefore, the evidence was not sufficient to support the forgery convictions.
The State submits that it is not required to show that Defendant actually took the $15,050 from the bank to prove the forgeries and notes that it was proved that the effect of the forgeries was to decrease the balances in the savings accounts and/or the shortage in the vault. The State argues that the jury was completely justified in *835 discrediting Defendant's testimony, rejecting her incredible explanation of how she was authorized to make the savings withdrawals for both customers. We agree with the State that there is sufficient evidence to support the jury's verdicts on the forgery counts.
Our review of the record reveals sufficient evidence that Defendant was guilty of both counts of forgery by placing signatures on two savings withdrawal slips without authority and with the intent to defraud. Not only did the State present an expert in handwriting analysis who testified that the withdrawal slips were written in Defendant's handwriting, but Defendant herself admitted signing both account holders' signatures on the withdrawal slips. The account holders testified that they never authorized Defendant to write their signatures on the savings withdrawal slips. Where there is conflicting testimony about factual matters, the resolution of which depends upon a determination of the credibility of the witnesses, the matter is one of the weight of the evidence, not its sufficiency. State v. Allen, supra. The appellate court does not assess the credibility of witnesses or reweigh evidence. State v. Smith, supra.
In addition, bank officials testified that the effect of the withdrawals, which are obviously writings having legal efficacy, was to decrease the balances in both victims' savings accounts. Recall that Defendant's intent to defraud need not be proved as a fact, but may be inferred from the circumstances and transactions of the case. State v. Satchfield, supra; State v. Fraley, supra. Further, contrary to the arguments presented by the defense, forgery, as defined by La. R.S. 14:72, does not require a "taking." This evidence, viewed in the light most favorable to the prosecution, was sufficient for a rational trier of fact to reasonably conclude that Defendant was guilty of two counts of forgery beyond a reasonable doubt. See Jackson v. Virginia, supra.

Felony Theft
Defendant argues that there is no direct evidence that she took the money  no eyewitnesses or videotape. She contends that the State failed to exclude the reasonable hypothesis that somebody else in the bank took the money and, therefore, the conviction for felony theft should not stand. We disagree.
La. R.S. 14:67 defines theft, in part, as follows:
A. Theft is the misappropriation or taking of anything of value which belongs to another, either without the consent of the other to the misappropriation or taking, or by means of fraudulent conduct, practices, or representations. An intent to deprive the other permanently of whatever may be the subject of the misappropriation or taking is essential.
The state must prove beyond a reasonable doubt that the defendant took something of value from the organization without its consent and had the intent to deprive the organization of the thing permanently to support a theft conviction. State v. Wilson, 01-0625 (La.App. 3d Cir.12/28/01), 806 So.2d 854, writ denied, 02-0323 (La.9/13/02), 827 So.2d 1121.
A review of the record in the instant case reveals that the evidence, viewed in the light most favorable to the prosecution, was sufficient for a rational trier of fact to reasonably conclude that all of the elements of the felony theft were proved beyond a reasonable doubt as per Jackson v. Virginia, supra. The State proved by direct evidence, including witness testimony and physical evidence, that Defendant took something of value ($120,000) from the bank without its consent and had the intent *836 to deprive the bank of the money permanently. As previously stated, Defendant argues that there is no direct evidence that she took the money, i.e., there are no eyewitnesses or videotape. Significantly, however, two different bank officials testified that Defendant admitted that she took the $120,000 in increments from the vault and spent it all. Further, Defendant admitted at trial that she falsified general ledger entries to conceal the $120,000 shortage, which shortage was verified by an audit.
Defendant also argues that the "intervening good count" of the vault on Friday, December 11, during Defendant's absence from work absolves her from responsibility for the shortage. This argument is not persuasive. The evidence indicates that Defendant was the vault teller and had access to the funds missing from the vault. There is also direct evidence that the vault count on Friday was based on the general ledger entries, which Defendant herself admitted at trial that she, as vault teller, falsified to reflect that the $120,000 shortage did not exist. Both tellers who participated in the "intervening" count testified that they did not take the money. Again, where there is conflicting testimony about factual matters, the resolution of which depends upon a determination of the credibility of the witnesses, the matter is one of the weight of the evidence, not its sufficiency. State v. Allen, supra. The appellate court does not assess the credibility of witnesses or reweigh evidence. State v. Smith, supra. We conclude that the evidence is sufficient to support the conviction of felony theft.

Motion for New Trial
La. C. Cr. P. art. 851(1) provides that the court shall grant a motion for new trial whenever the verdict is contrary to the law and the evidence, i.e., that the evidence was insufficient to sustain the conviction. A motion for new trial presents only the issue of the weight of the evidence. Under this article the trial judge has wide discretion to determine the weight of the evidence. The refusal to grant such a motion is not subject to appellate review, except for error of law. State v. Mitchell, 26,070 (La.App.2d Cir.6/22/94), 639 So.2d 391, writ denied, 94-1981 (La.12/16/94), 648 So.2d 387; State v. Robinson, 624 So.2d 1260 (La.App. 2d Cir.1993), writ denied, 93-2899 (La.2/11/94), 634 So.2d 372; State v. Thomas, 609 So.2d 1078 (La.App. 2d Cir.1992), writ denied, 617 So.2d 905 (La.1993).
As previously discussed, the record contains sufficient evidence to support Defendant's convictions; and, therefore, the verdicts were not contrary to the law and evidence and the trial court properly denied the motion for new trial.
Assignment of Error Number Three: Scope of Rebuttal Questioning of Rhonda George
During Defendant's presentation of evidence, issues were raised regarding security cameras in the bank branch. The State recalled Ms. George as a rebuttal witness to testify that the bank would record over surveillance tapes after they ran rather than replace them with new tapes. On cross-examination, the defense questioned the witness regarding an entry from Mr. Vizzard regarding things recorded on the tape for December 15. Then the defense proceeded to question Ms. George about whether she had access to two safety deposit boxes at the bank. She answered that she did. The State objected to the question on the basis that it exceeded the scope of matters presented on rebuttal, which objection was sustained by the trial court. The defense's objection to the ruling was noted for the record and a proffer was made of the bank record log *837 showing the two safety deposit boxes to which Ms. George had access.
Defendant argues that this was a proper subject for cross-examination during rebuttal because the State had questioned Defendant concerning her access to a safety deposit box. Defendant contends that the questions would support the hypothetical, reasonable possibility that someone other than the Defendant secreted the money into a safety deposit box. Defendant argues, generally, without citing any specific law, that the ruling violated her right to confrontation and was prejudicial because she was not allowed to present evidence that was exculpatory in nature. She concludes that she was denied a right to present a defense and to a fair trial and that her convictions, therefore, should be overturned and the sentences should be vacated. We disagree.
La. C.E. art. 611(E) provides in part that the state in a criminal prosecution shall have the right to rebut evidence adduced by their opponents. "Rebuttal evidence" is that which is offered to explain, repel, counteract or disprove facts given in evidence by the adverse party; in criminal cases, such evidence may be used to strengthen the state's original case. State v. Huizar, 414 So.2d 741 (La.1982); State v. Widenhouse, 582 So.2d 1374 (La. App. 2d Cir.1991), writ denied, 586 So.2d 567 (La.991), cert. denied, 503 U.S. 910, 112 S.Ct. 1274, 117 L.Ed.2d 500. Also see State v. Koon, 96-1208 (La.5/20/97), 704 So.2d 756, rehearing pending, cert. denied, 522 U.S. 1001, 118 S.Ct. 570, 139 L.Ed.2d 410. When rebuttal goes beyond the usual and injects new issues and evidence into the proceeding, elemental fairness requires that the defense be allowed to meet that showing by adducing additional evidence on point in surrebuttal. A failure to afford a defendant this opportunity has been held to be reversible error. State v. Koon, supra.
The determination of whether evidence is rebuttal evidence and hence, admissible, is an issue which is addressed to the sound discretion of the trial court judge. State v. Huizar, supra; State v. Green, 390 So.2d 1253 (La.1980).
The record does not reflect that the State's rebuttal in this case went beyond the usual and injected new issues and evidence regarding access to safety deposit boxes into the proceeding. See State v. Koon, supra. Hence, under these facts and the applicable law, we conclude that the trial court did not abuse its sound discretion in sustaining the State's objection to the defense's questioning of the State's rebuttal witness regarding safety deposit box access. See State v. Huizar, supra; State v. Green, supra.
Assignment of Error Number Four: Jury Instruction on Motive
The State requested and was granted the following special jury instruction: "The State does not have to prove a motive. The State is only required to prove, beyond a reasonable doubt, each and every element of the crime." In arguing against the special instruction, Defendant asserted that it amounted to an impermissible comment on the evidence. The trial court ruled that the instruction would be included, finding that it did not instruct the jury to restrict its consideration of the evidence presented in any manner when read "in total" with the rest of the charge to be given to the jury. We find no error in the trial court's inclusion of the instruction.
The court shall charge the jury: (1) as to the law applicable to the case; (2) that the jury is the judge of the law and of the facts on the question of guilt or innocence, but that it has the duty to accept *838 and to apply the law as given by the court; and (3) that the jury alone shall determine the weight and credibility of the evidence. La. C. Cr. P. art. 802. A requested special charge shall be given by the court if it does not require qualification, limitation or explanation, and if it is wholly correct and pertinent. It need not be given if it is included in the general charge or in another special charge to be given. La. C. Cr. P. art. 807; State v. Gipson, 28,113 (La. App.2d Cir.6/26/96), 677 So.2d 544, writ denied, 96-2303 (La.1/31/97), 687 So.2d 402. A judgment or ruling shall not be reversed by an appellate court because of any error, defect, irregularity or variance which does not affect substantial rights of the accused. La. C. Cr. P. art. 921.
The record supports the trial court's granting of the State's request for the special jury instruction that the State does not have to prove a motive because motive was indeed alluded to as a defense to both crimes. The requested special charge did not require qualification, limitation or explanation and was wholly correct and pertinent. Furthermore, it was not included in the general charge or in another special charge to be given. See La. C. Cr. P. art. 807; State v. Gipson, supra. Thus, the trial court did not err in granting the State's request for the special jury instruction.
Assignment of Error Number Six: Exclusion of Polygraph Examination at Sentencing
Defendant filed a motion to present polygraph examination evidence subsequent to her convictions and prior to sentencing. The trial court held a Daubert[2] hearing to determine the admissibility of expert testimony in the form of a polygraph examination. Subsequently, the trial court ruled that the expert opinion would be unreliable and not relevant. It also found that there was an insufficient showing that accepted test procedures were utilized in the polygraph test administered to Defendant. The trial court noted the fact that the defense's witness was also represented by the defense attorney in what it assumed is a "hotly contested" custody relocation case. Finally, the trial court specifically stated that it would not consider Defendant's lack of remorse as an aggravating factor in sentencing.
Defendant argues that polygraph evidence can be relevant at sentencing, particularly when the defendant continued to protest her innocence and would therefore show no lack of remorse and abuse of trust. She argues that the ruling of the trial court was prejudicial because the court should consider all relevant evidence in deciding on a sentence. We find no error in the trial court's ruling.
La. C.E. art. 702, regarding testimony by experts, provides:
If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.
The standard for accepting expert testimony was set forth in State v. Foret, 628 So.2d 1116 (La.1993), wherein the supreme court adopted the test set forth in Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993); State v. Boudreaux, 41,660 (La.App.2d Cir.12/13/06), 945 So.2d 898. Daubert requires the trial court to *839 act in a gatekeeping function to ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable. State v. Chauvin, 02-1188 (La.5/20/03), 846 So.2d 697.
A trial court has great discretion in determining the competence of an expert witness, and that determination will not be overturned absent an abuse of discretion. La. C.E. art. 702; State v. Gipson, 37,132 (La.App.2d Cir.6/25/03), 850 So.2d 973, writ denied, 03-2238 (La.1/30/04), 865 So.2d 75. The test of competency of an expert is his knowledge of the subject about which he is called upon to express an opinion. A combination of specialized training, work experience and practical application of the expert's knowledge can combine to demonstrate that a person is an expert. State v. Allen, supra; State v. Gipson, supra.
The results of a polygraph examination are inadmissible for any purpose at a criminal trial. See, State v. Legrand, 02-1462 (La.12/3/03), 864 So.2d 89, cert. denied, 544 U.S. 947, 125 S.Ct. 1692, 161 L.Ed.2d 523 (2005); State v. Weatherspoon, 06-539 (La. App. 5th Cir.12/12/06), 948 So.2d 215. See also Hines v. Arkansas Louisiana Gas Company, 613 So.2d 646 (La.App. 2d Cir.1993), writ denied, 617 So.2d 932 (La. 1993). In State v. Legrand, supra, the supreme court stated that the rule excluding polygraph evidence "operates to prevent any reference during trial to the fact that a witness has taken a polygraph examination with respect to the subject matter of his testimony." State v. Legrand, supra, citing State v. Hocum, 456 So.2d 602 (La.1984); State v. Tonubbee, 420 So.2d 126 (La.1982), cert. denied, 460 U.S. 1081, 103 S.Ct. 1768, 76 L.Ed.2d 342 (1983); State v. Davis, 407 So.2d 702 (La. 1981); State v. Catanese, 368 So.2d 975 (La.1979); State v. Weatherspoon, supra. The supreme court explained that such evidence is prohibited because it "invites a probable inference by the jury that the witness passed the polygraph examination and therefore is testifying truthfully," thereby usurping the jury's prerogative on a question involving credibility. Id., quoting State v. Hocum, supra; State v. Davis, supra; State v. Weatherspoon, supra. The supreme court further noted that polygraph information and test results are inadmissible "either as substantive evidence or as relating to the credibility of a party or witness." State v. Legrand, supra, quoting State v. Humphrey, 445 So.2d 1155 (La.1984); State v. Weatherspoon, supra.
In State v. Catanese, supra, the court held:
The reasons for the exclusion of polygraph evidence from criminal trials do not necessarily prevent its use in all criminal proceedings. The polygraph technique has advanced to the point that it could be extremely valuable in criminal proceedings provided its admissibility is carefully limited to specific circumstances designed to insure the validity of the evidence and the proper administration of criminal justice. A number of courts have attempted to avoid the problems inherent in the use of polygraph evidence by limiting its admissibility to certain types of proceedings. The Michigan Supreme Court held that polygraph evidence, while inadmissible at trial, would be admitted in a hearing upon a motion for a new trial. Polygraph test results have been admitted into evidence in a number of preliminary and post-trial criminal proceedings.
Although we conclude that polygraph evidence is inadmissible in criminal trials, the reasons for our decision do not prevent its introduction in post trial proceedings, within judicial discretion and *840 subject to guidelines such as those laid down by the trial judge in the instant case. Because the defendant's guilt or innocence is not at issue in such proceedings, there is less demand for the rigorous guarantees of accuracy which typify the rules governing introduction of evidence at trial. Consequently, the reasons for excluding polygraph evidence in criminal trials are not necessarily compelling in post trial proceedings. This avenue of admissibility, therefore, should be open, within the discretion of the trial judge, whenever the evidence is reliable and will aid in a decision. Moreover, the experience gained in this way will perhaps facilitate a more informed conclusion on the question of admissibility of polygraph results in criminal trials. (Internal citations omitted.)
In State v. Cosey, 97-2020 (La.11/28/00), 779 So.2d 675, cert. denied, 533 U.S. 907, 121 S.Ct. 2252, 150 L.Ed.2d 239 (2001), the defense argued that, even if the polygraph reports were not admissible at the guilt phase, they should have been admissible at the penalty phase. The court cited State v. Robertson, 97-0177 (La.3/4/98), 712 So.2d 8, cert. denied, 525 U.S. 882, 119 S.Ct. 190, 142 L.Ed.2d 155 (1998), and stated that the penalty phase of a capital murder trial is not a post-trial proceeding within the meaning of Catanese and held that polygraph evidence was not admissible in the penalty phase.[3] (Emphasis added.)
The defense only argues that polygraph evidence can be relevant at sentencing, particularly in the instant case where the defendant continued to protest her innocence and would therefore show no lack of remorse and abuse of trust. Without delving into a detailed analysis of the factors considered at the Daubert hearing, which is not contested by the defense, the record and the law supports the trial court's decision that the polygraph evidence was irrelevant and inadmissible at sentencing in the case sub judice. The law is clear that results of a polygraph examination are inadmissible for any purpose at a criminal trial. See, State v. Legrand, supra; State v. Weatherspoon, supra. The cases cited by the defense for holding that polygraphs should be admissible in the penalty phase are factually distinguishable from the case at bar and fail to support the propositions for which they are cited. See State v. Cosey, supra; State v. Robertson, supra. As a measure to insure no prejudice from this ruling, the trial court specifically stated that it would not consider Defendant's lack of remorse as an aggravating factor in sentencing. Defendant's arguments are without merit.
Assignment of Error Number Seven: Excessive Sentence
For each of her two forgery convictions, Defendant's sentencing exposure was to be fined not more than five thousand dollars, or imprisoned, with or without hard labor, for not more than ten years, or both. La. R.S. 14:72 D. The possible punishment Defendant faced for felony theft was imprisonment, with or without hard labor, for not more than ten years, a fine of not more than three thousand dollars, or both. See La. R.S. 14:67 B(1). Defendant received two two-year sentences to be served concurrently on the forgery counts and one seven-year sentence, suspended, on the felony theft count.
*841 The test imposed by the reviewing court in determining the excessiveness of a sentence is two-pronged. First, the record must show, as it does in the case at bar, that the trial court took cognizance of the criteria set forth in La. C. Cr. P. art. 894.1. The trial judge is not required to list every aggravating or mitigating circumstance so long as the record reflects that he adequately considered the guidelines of the article. State v. Smith, 433 So.2d 688 (La.1983); State v. Dunn, 30,767 (La.App.2d Cir.6/24/98), 715 So.2d 641. The articulation of the factual basis for a sentence is the goal of La. C. Cr. P. art. 894.1, not rigid or mechanical compliance with its provisions. Where the record clearly shows an adequate factual basis for the sentence imposed, remand is unnecessary even where there has not been full compliance with La. C. Cr. P. art. 894.1. State v. Lanclos, 419 So.2d 475 (La.1982); State v. Hampton, 38,017 (La. App.2d Cir.1/28/04), 865 So.2d 284, writs denied, 04-0834 (La.3/11/05), 896 So.2d 57 and 04-2380 (La.6/3/05), 903 So.2d 452. The important elements which should be considered are the defendant's personal history (age, family ties, marital status, health, employment record), prior criminal record, seriousness of offense and the likelihood of rehabilitation. State v. Jones, 398 So.2d 1049 (La.1981); State v. Haley, 38,258 (La.App.2d Cir.4/22/04), 873 So.2d 747, writ denied, 04-2606 (La.6/24/05), 904 So.2d 728. There is no requirement that specific matters be given any particular weight at sentencing. State v. Jones, 33,111 (La.App.2d Cir.3/1/00), 754 So.2d 392, writ denied, 00-1467 (La.2/2/01), 783 So.2d 385.
Second, a sentence violates La. Const. art. 1, § 20, if it is grossly out of proportion to the seriousness of the offense or nothing more than a purposeless and needless infliction of pain and suffering. State v. Smith, 01-2574 (La.1/14/03), 839 So.2d 1; State v. Dorthey, 623 So.2d 1276 (La.1993); State v. Bonanno, 384 So.2d 355 (La.1980). A sentence is considered grossly disproportionate if, when the crime and punishment are viewed in light of the harm done to society, it shocks the sense of justice. State v. Weaver, 01-0467 (La.1/15/02), 805 So.2d 166; State v. Lobato, 603 So.2d 739 (La. 1992); State v. Hogan, 480 So.2d 288 (La. 1985); State v. Bradford, 29,519 (La. App.2d Cir.4/2/97), 691 So.2d 864.
When the defendant's crimes and punishments are viewed in light of the harm done to society by such total disregard for the property of others, including the "nest eggs" of elderly, trusting citizens, they do not shock the sense of justice. State v. Weaver, supra; State v. Lobato, supra; State v. Hogan, supra.
Furthermore, a trial court is not required to render a suspended sentence or probation on a first-felony offense, such as is the case sub judice. The judge may consider whatever factors and evidence he deems important to a determination of the best interest of the public and the defendant. See State v. Bradford, supra; State v. Woodman, 28,004 (La.App.2d Cir.1/24/96), 666 So.2d 1255, writ denied, 96-0489 (La.5/3/96) 672 So.2d 696. See also State v. Flores, 27,736 (La.App.2d Cir.2/28/96), 669 So.2d 646.
The trial judge is given a wide discretion in the imposition of sentences within the statutory limits, and the sentence imposed by him should not be set aside as excessive in the absence of a manifest abuse of his discretion. State v. Williams, 03-3514 (La.12/13/04), 893 So.2d 7; State v. Thompson, 02-0333 (La.4/9/03), 842 So.2d 330; State v. Washington, 414 So.2d 313 (La.1982); State v. Abercrumbia, 412 So.2d 1027 (La.1982). A trial judge is in the best position to consider the *842 aggravating and mitigating circumstances of a particular case, and, therefore, is given broad discretion in sentencing. State v. Cook, 95-2785 (La.5/31/96), 674 So.2d 957, cert. denied, 519 U.S. 1043, 117 S.Ct. 615, 136 L.Ed.2d 539 (1996). On review, an appellate court does not determine whether another sentence may have been more appropriate, but whether the trial court abused its discretion. Id.
In this case, the record does not reflect that the trial court manifestly abused its discretion in imposing the two-year hard labor sentences for the two forgery convictions. It is not for an appellate court to determine whether another sentence may have been more appropriate. See State v. Cook, supra. As previously noted, the trial judge thoroughly applied and discussed the article 894.1 factors in this case. The actual length of incarceration is a small fraction of the total sentencing exposure faced by Defendant. The sentences are not shocking to our sense of justice and are not, therefore, unconstitutionally excessive.
Assignment of Error Number Eight: Restitution
After the verdict, the State filed a motion to set restitution pursuant to the provisions of La. C. Cr. P. art. 895.1. After a hearing, the court set restitution as described hereinabove. The defense argues that restitution in this matter is subject to a separate civil proceedinga fact that was abundantly clear to the trial court. Yet, despite the ongoing civil case, the defense argues that the trial court granted the motion to set restitution, and, in fact, ordered restitution. Defendant submits that the part of the sentence setting restitution should be set aside and the issue remanded to the companion civil case. We disagree.
In 2003, when the offenses were committed, La. C. Cr. P. art. 895.1(A) provided in pertinent part:
(1) When a court places the defendant on probation, it shall, as a condition of probation, order the payment of restitution in cases where the victim or his family has suffered any direct loss of actual cash, any monetary loss pursuant to damage to or loss of property, or medical expense. . . .
(Emphasis added.)
In ordering restitution, the trial judge has discretion and his decision will not be disturbed absent an abuse of this discretion. State v. Stephenson, 30,271 (La.App.2d Cir.1/21/98), 706 So.2d 604, writ denied, 98-0426 (La.6/19/98), 720 So.2d 1211.
Since the trial court suspended Defendant's seven-year sentence for felony theft and placed Defendant on probation, La. C. Cr. P. art. 895.1(A) clearly required the trial court to order the payment of restitution as a condition of probation where the victim(s) have suffered any direct loss of actual cash, etc. The record does not reflect that the trial court abused its discretion. See State v. Stephenson, supra.
Assignment of Error Number Nine: Error Patent
Defendant's final assignment was a request for this court to review the record for errors patent. This request is unnecessary since such a review is made automatically in all criminal cases. State v. Bryant, 29,344 (La.App.2d Cir.5/7/97), 694 So.2d 556. We have reviewed the record for errors patent and found none.

CONCLUSION
For the foregoing reasons, the convictions and sentences of Defendant, Melecia (aka Lecia) Franklin, are affirmed.
AFFIRMED.

*843 ON REHEARING
PER CURIAM.
Early in our opinion it is stated that two unauthorized withdrawals were made from the accounts of Ms. Lillian Green and Ms. Willie Smith in the amounts of $5,500 and $9,550 respectively. Later in our opinion, it is stated that these two withdrawals created cash out items totaling "$9,550." This total is incorrect and should reflect the sum of the two unauthorized withdrawals to be $15,050. We, therefore, amend the opinion to substitute the correct figure of $15,050. In all other respects, the rehearing is denied.
NOTES
[1] Defendant does not contest that this writing purported to have legal efficacy. As the court noted in State v. Daigle, 95-2393 (La.App. 1st Cir.9/27/96), 681 So.2d 66, the Reporter's Comments to Revised Statute 14:72: "All writings of serious enough nature to be considered subject matter of this crime `purport to have legal efficacy.'"
[2] Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).
[3] Defendant incorrectly states that State v. Robertson, supra, held that polygraph evidence was admissible in the penalty phase of a capital case, when the court, in fact, held that the evidence was inadmissible.